**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juan MONTOYA, Augustine Gomez,
and Augustine Ramirez,
Defendants–Appellants.**

**Nos. 88–1417, 88–1418 and 88–1419.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1989.

Decided Dec. 19, 1989.

Elliott M. Samuels, Kathryn Hall, Jerry B. Kurz, argued, Chicago, Ill., Leonard C. Remencius and Mary J. Gaziano, argued, Remencius & Associates, Rockford, Ill., for defendants-appellants.

Keith C. Seyfert, Asst. U.S. Atty., Office of the U.S. Atty., Rockford, Ill. and James T. Zuba (argued), for plaintiff-appellee.

Before WOOD, Jr., POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Defendants Juan Montoya, Augustine Gomez and Augustine Ramirez were convicted of conspiracy to possess with intent to distribute and to distribute cocaine and

1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 846. Montoya was also convicted of distributing approximately 12.36 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). Gomez and Ramirez appeal their convictions and sentences on the conspiracy charge. Montoya appeals his sentence for conspiracy and distribution of cocaine. We remand Ramirez's case to the district court for resentencing. In all other respects, we affirm.

## I. FACTUAL BACKGROUND

Montoya, Gomez and Ramirez were convicted in the United States District Court for the Northern District of Illinois for their involvement with an international drug trafficking conspiracy operating in Rockford, Illinois. Beginning in 1982, this operation, through the use of automobiles, vans and trucks with hidden storage compartments, as well as airplanes, imported large quantities of cocaine and marijuana from Mexico into the United States. Most of the narcotics were smuggled across the Mexico–Texas border and subsequently transported for distribution in the Rockford, Illinois, area. The organization employed a large number of persons to import, transport, store and sell narcotics. The conspiracy also employed individuals to transport and distribute the profits derived from illicit drug sales among the various co-conspirators, most of whom resided in Rockford. In mid–1986 confidential informants, working with Rockford law enforcement officers and the United States Drug Enforcement Administration ("DEA"), infiltrated the drug ring and provided the law enforcement officials with the identities of the key figures in the drug network, as well as their respective drug-related activities. Additionally, the informants purchased drugs from and tape recorded a number of conversations with various members in the drug conspiracy. Based largely on this evidence and other information, a grand jury indicted twenty-one individuals, including the three defendants involved in this appeal, and charged them with a number of violations of the federal narcotics laws. At this point, the cases of the defendants diverge, necessitating for the sake of clarity that we consider separately the relevant facts and issues as they relate to each of the individual defendants.

## II. JUAN MONTOYA

### A.

Defendant Montoya was arrested in his home in Rockford on July 19, 1987, and was charged with one count of conspiracy to possess with intent to distribute and to distribute cocaine and 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 846 (Count One). Montoya was also charged with one count of distributing approximately 12.36 grams of cocaine (Count Nine), one count of possession with intent to distribute approximately 893.65 grams of marijuana (Count Thirteen), and one count of possession with intent to distribute approximately 615.11 grams of cocaine (Count Fourteen), all in violation of 21 U.S.C. § 841(a)(1). On June 22, 1987, Montoya, appearing with counsel, entered a plea of not guilty. Pursuant to a plea agreement, Montoya subsequently withdrew his original not guilty plea and entered a plea of guilty to Counts One and Nine of the indictment on December 23, 1987; the government, in turn, agreed to and did dismiss the charges against Montoya contained in Counts Thirteen and Fourteen. After a hearing, the court determined that Montoya's decision to plead guilty was made freely, voluntarily and with full knowledge of the rights he was relinquishing and accepted Montoya's plea of guilty. Thereafter, the court ordered the preparation of a presentence report and set sentencing for February 25, 1988.

The presentence report contained both the defendant's and the government's statements detailing Montoya's involvement in the conspiracy. According to Montoya, he had been selling marijuana since 1985 and cocaine since 1987. At the time of his arrest, Montoya admitted to selling approximately twenty pounds of marijuana a month, profiting between $50 and $100 per pound. Montoya also admitted to selling approximately one ounce of cocaine a month and earning between $600 and $800

per ounce. Montoya stated that he had never possessed more than 200 pounds of marijuana, nor more than one kilogram of cocaine at any one time.

The government, in its version of Montoya's drug-related activities, stated that Montoya was "heavily involved in the distribution of marijuana and cocaine." The government based its conclusion largely on Montoya's conversations with a government informant. Specifically, on August 29, 1986, the government informant met with Montoya in his home and Montoya presented her with a one-pound package of marijuana, stating that it was part of a 2,000–pound load from Mexico which he had sold for between $750 and $900 per pound. Montoya also stated that he was selling both marijuana and cocaine and that he was working with Tomas Perez [1] and an individual named Tony.[2]

In a recorded conversation on January 20, 1987, Montoya and his wife, Donna,[3] told the informant that they were willing to sell her cocaine, stating that they would teach her how to cut and package the cocaine so she could resell it at a profit. The following day, January 21, in another recorded conversation, Montoya told the informant that he purchased approximately one kilogram of cocaine a month, stating that he sold each kilogram at a profit of $24,000 and that he could "see" $110,000 in one night.[4] Montoya again encouraged the informant to start her own cocaine business and explained how to cut the drug for resale. Montoya also stated that he had 2,000 pounds of marijuana available and

that, at one time, he received a profit in the amount of $18,000 on the sale of twenty pounds. Later in the conversation, Montoya admitted that at one time, one of his marijuana shipments had been confiscated by the authorities. On January 22, 1987, Montoya sold the informant approximately 12.36 grams of cocaine for $900.

Finally, in a recorded conversation on June 16, 1987, Montoya told the informant that he was still in the "business" and that he would sell her an ounce of cocaine at a reduced price ($1,500 as opposed to $1,900) in order that she might make a profit on the resale. When he was arrested on June 19, 1987, Montoya was in possession of 615 grams of cocaine, 894 grams of marijuana, a .22 caliber weapon, $869 worth of food stamps, and a public aid card. The government posited that Montoya was selling narcotics in exchange for the food stamps and using the public aid card to receive welfare benefits to which he was not entitled because of his income from illicit drug sales.

Referring to the government's version of the facts, the probation officer who prepared the presentence report stated that, in his opinion, Montoya was one of the more culpable participants in this conspiracy. The officer also stated:

"It is uncertain as to whether or not the defendant was working for [Tomas Perez, Antonio Franco, and Raul Ramirez [5]], but it is possible that he obtained drugs from them. The defendant was extensively involved in the sale of marijuana and cocaine, and allowed his wife to also become involved in a periph-

---

1. Tomas Perez pled guilty to and was convicted of conspiracy (Count One) and distributing 916 grams of marijuana (Count Twelve). Perez was sentenced to 21 years' imprisonment with a period of two years' supervised release to follow. We rejected Perez's challenge to his sentence in *United States v. Perez,* 858 F.2d 1272 (7th Cir. 1988).

2. According to the government, Montoya's statement that he was working with "Tony" is a reference to Antonio Franco. Franco was convicted of conspiracy (Count One) and sentenced to thirty-five years' imprisonment. We upheld Franco's conviction on appeal in *United States v. Franco,* 874 F.2d 1136 (7th Cir.1989).

3. Donna Montoya pled guilty to and was convicted of conspiracy (Count One) and possessing with intent to distribute approximately 893.65 grams of marijuana (Count Thirteen). She was sentenced to a term of three years' probation.

4. *See infra* note 6.

5. Raul Ramirez, the brother of defendant-appellant Augustine Ramirez, pled guilty to and was convicted of conspiracy (Count One) and possessing with intent to distribute 35 grams of marijuana (Count Seven). He was sentenced to fifteen years' incarceration with a term of three years' supervised release to follow. We affirmed Ramirez's sentence on appeal. *See Perez, supra* note 1.

eral role. In further aggravation, is the fact that this defendant also attempted to recruit at least one individual to also become a seller of narcotics."

The probation officer also concluded that Montoya had not shown a great deal of remorse for his involvement in the conspiracy; rather, he attempted to justify his illicit drug activities based on his inability to secure legitimate employment.

At the sentencing hearing held on February 25, 1988, Montoya challenged numerous facts described by the government in the presentence report. Specifically, he alleged that: (1) he never had a conversation with the informant on August 29, 1986; (2) during the January 21, 1987, conversation he stated that he could "owe" $110,000 in one night, as opposed to the government's statement that he could "see" that amount;[6] (3) regarding the 20–pound marijuana sale, also discussed in the January 21 conversation, he told the informant he made $2,000 on the sale rather than $18,-000; (4) he told the informant that others had had marijuana shipments confiscated, but that this had never happened to him; (5) his statement during the June 16, 1987, conversation that he was still in the "business" was a reference to the grocery store he owned and had nothing to do with his drug-related activities; (6) he was in possession of 588, as opposed to 615 grams of cocaine at the time of his arrest; (7) he was justified in his possession of both the food stamps and the public aid card, explaining that the food stamps were from his grocery store and that the public aid card was for his infant son's medical expenses; (8) he had never recruited the informant to sell narcotics; and (9) he had never purchased narcotics from Perez, Franco or Raul Ramirez. Montoya also objected to the probation officer's conclusion that he was one of the more culpable participants in the conspiracy, arguing that this conclusion was apparently based on disputed information in the government's version of the facts, as well as the probation officer's opinion that he had not shown any remorse for his actions.

■ After listening to the arguments presented at sentencing, including Montoya's disagreement with the government's evidence, the district court sentenced Montoya to 15 years' imprisonment on Count One and a consecutive sentence of 3 years on Count Nine with a three-year period of supervised release to follow. In passing sentence, the trial judge stated that it was clear to him that Montoya was heavily involved in the distribution of cocaine and marijuana. The judge also noted that Montoya had involved his wife in his illicit activities. Further, the court agreed with the conclusion that Montoya expressed no remorse for his involvement in the conspiracy, noting the defendant's refusal to cooperate with the government in identifying the suppliers and purchasers with whom he engaged in narcotics transactions. Our review of the sentencing transcript reveals that the trial court made no findings concerning the evidence Montoya challenged at the sentencing hearing, nor did the United States Attorney or defense counsel request that the court make further findings concerning the disputed evidence. Thus, Montoya's challenges to the content of his conversations with the informant, as well as his explanations concerning the narcotics, food stamps and public aid card confiscated at the time of his arrest, were not resolved at the time of sentencing. Three weeks after the sentencing hearing, on March 21, 1988, the district court filed a written determination pursuant to Fed.R. Crim.P. 32(c)(3)(D),[7] stating that at sentenc-

---

**6.** The defendant stated that the government's use of the term "see" was an attempt to portray Montoya as someone "coming into large sums of money nightly, when the same simply was not the case." The government replied that whether "see" or "owe" was the proper word, the context of the conversation revealed that Montoya was dealing in substantial quantities of narcotics for large sums of money.

**7.** Rule 32(c)(3)(D) provides:
"If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter

ing Montoya had challenged numerous facts contained in the presentence report and that none of the disputed matters were relied upon in passing sentence on the defendant.

Montoya now appeals his sentence, arguing that he is entitled to be resentenced because the trial court violated Rule 32(c)(3)(D) in failing to determine at the time of sentencing that none of the facts disputed by the defendant at the sentencing hearing had been considered in formulating Montoya's term of incarceration. Montoya also argues that he was sentenced in violation of his due process rights because the sentence imposed by the court was based on inaccurate information.

### B.

When a defendant alleges inaccuracies in his presentence report, Fed.R.Crim.P. 32(c)(3)(D) requires that the sentencing judge make findings as to the allegations or a determination that the disputed matters will not be relied upon in passing sentence prior to or contemporaneous with sentencing.[8] The rule also requires that the court attach a record of its findings or determination to the presentence report. This rule serves to protect "a defendant's due process right to fair sentencing procedures, particularly the right to be sentenced based on accurate information." *United States v. Eschweiler*, 782 F.2d 1385, 1387 (7th Cir.1986). Another purpose of this rule is to provide a clear record of the disposition and resolution of controverted facts in the presentence report. *United States v. Perez*, 858 F.2d 1272, 1276 (7th Cir.1988).

"In order to be resentenced under Rule 32(c)(3)(D), the defendant must show that: '(1) the allegations of inaccuracy were before the sentencing court and (2) the court failed to make findings regarding the con-

troverted matters or a determination that the disputed information would not be used in sentencing.'" *Id.* at 1276–77 (quoting *Eschweiler*, 782 F.2d at 1389). Montoya concedes that the district court made a written determination that none of the disputed matters had been considered in sentencing, but argues that under Rule 32(c)(3)(D) the court was required to make this determination prior to or at the time of imposing sentence. Due to the court's failure to make this determination until three weeks after the sentencing hearing, the defendant contends that we are required to remand his case to the district court for resentencing.

The resolution of this issue is not as simple as the defendant would have us believe. Although "Rule 32 contemplates that if an assertion will not be relied on, a finding to that effect will be made before or contemporaneously with the sentencing," the failure to do so is subject to harmless error analysis. *Kramer v. United States*, 798 F.2d 192, 195 (7th Cir.1986). In *Eschweiler*, this court stated that a trial court's failure to strictly comply with the dictates of Rule 32(c)(3)(D) warrants resentencing only when such would further the purposes underlying the rule. 782 F.2d at 1390. The government contends that despite the district court's failure to make the Rule 32(c)(3)(D) determination in a timely fashion, the purposes of the rule have nevertheless been served in this case, and thus, Montoya is not entitled to a resentencing hearing. Upon review of the sentencing transcript, we agree.

As noted above, one of the purposes of Rule 32(c)(3)(D) is to protect a defendant's due process right to fair sentencing. This right encompasses the right to be sentenced on the basis of accurate information. *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d

---

controverted *will not be taken into account* in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons."
(Emphasis added). As the highlighted language within the rule makes clear, the trial court must

make its nonreliance determination, if one is to be made, prior to or contemporaneous with sentencing. *See Kramer v. United States*, 798 F.2d 192, 195 (7th Cir.1986).

**8.** *See supra* note 7.

592 (1972). Montoya argues that the trial court's untimely nonreliance determination fails to satisfy this purpose of Rule 32(c)(3)(D). According to him, it is obvious that the district court did, in fact, consider the challenged, allegedly unreliable information, contrary to the court's explicit statement that it did not, because without considering the challenged information, the court could not have concluded that the defendant was heavily involved in the distribution of cocaine and marijuana. Although the trial court did not refer to specific evidence in reaching this conclusion, Montoya has failed to demonstrate that the court's conclusion was based on the evidence Montoya disputed at trial. As an initial matter, we are of the opinion that Montoya's admissions and the court's conclusion is most certainly supportable based solely on the *unchallenged* evidence presented at sentencing. The defendant admitted that he had been engaged in selling marijuana for two years prior to his arrest in June 1987, and, furthermore, that he had access to approximately 2,000 pounds of the drug. He also stated that in the past he had possessed up to 200 pounds of the drug at various times, and furthermore, that he had in fact sold 20 pounds for $2,000. Montoya also admitted that he began selling cocaine in 1987, possessing up to one kilogram a month and earning a profit in the amount of $24,000 on each kilogram he sold. Further, Montoya conceded that he had 588 grams of cocaine and 894 grams of marijuana in his possession at the time of his arrest. Based on this evidence alone, we are of the opinion that the trial judge was justified in concluding that Montoya was heavily involved in the distribution of narcotics.

More importantly, we find no evidence in the record to support Montoya's contention that the district court considered any of the information Montoya challenged at sentencing. Interestingly enough, the defendant refers to only one statement of the court regarding the challenged information —namely, the court's statement that Montoya had shown no remorse for his crimes. The trial judge did, in fact, state that he agreed with the opinion of Montoya's presentence investigation probation officer that Montoya had shown little remorse for his crimes, specifically referring to Montoya's lack of cooperation in the government's continuing investigation of the narcotics conspiracy involved in this case. However, this statement is sufficiently specific to constitute a factual finding under Rule 32(c)(3)(D). Although the court stated that it had not relied on any of the disputed facts in sentencing Montoya, the only disputed matter that the court referred to at the sentencing hearing was clearly resolved on the record. Thus, other than the question of Montoya's lack of remorse, which was resolved at the time of sentencing, we conclude that the trial judge's remarks at sentencing are consistent with his determination that he had not relied on any of the disputed matters in passing sentence on Montoya.[9] "Of course it is possible that the judge's memory was playing tricks on him, that in fact when he sentenced [the defendant] he was under the influence of information in the presentence report that he didn't bother to mention, and that ... he forgot about his unrecorded mental processes." *Johnson v. United States*, 805 F.2d 1284, 1289 (7th Cir.1986). However, this mere possibility delving into the vast and uncharted valley of speculation, standing alone, is insufficient to establish that the sentencing court relied on the information disputed in this case.

Thus, we reject Montoya's challenge to the district court's nonreliance determination, but emphasize, as we have done in the past, "that our acceptance of such *ex post facto* determinations of nonreliance is at best reluctant—justified in this case *only* by our firm belief that the sentencing transcript accurately reflects [the district

---

**9.** In light of our holding that Montoya has failed to establish that the trial court relied on any of the disputed information, we need not consider his contention that the court violated his due process right to be sentenced on the basis of accurate information by considering the dis-

puted information. *See Eschweiler,* 782 F.2d at 1387 ("[I]n order to show a due process violation, the defendant must raise grave doubt as to the veracity of the information and show that the court relied on that false information in determining the sentence.").

court's] reasons for imposing the sentence [it] did." *Blake v. United States*, 841 F.2d 203, 207 n. 3 (7th Cir.1988) (emphasis in original).

 We also conclude that the second purpose of Rule 32—namely, appending the presentence report with a record of the disposition and resolution of the challenged facts—has been satisfied. This purpose is aimed at "providing the Bureau of Prisons ... with a complete record to use in [its] decision-making process." *United States v. Moran*, 845 F.2d 135, 139 (7th Cir.1988). Although the court initially failed to attach a record detailing the resolution of the disputed matters to the presentence report, a copy of the sentencing transcript, as well as the court's nonreliance determination,[10] has since been appended to the presentence report and filed in the record on appeal. This is sufficient to satisfy Rule 32's purpose of creating a record detailing the information relied upon by the sentencing court. *See Perez*, 858 F.2d at 1277.

Based upon our review of the record, we are convinced that the purposes of Rule 32(c)(3)(D) have been served. Thus, we hold that the court's failure to make a timely determination that none of the disputed matters would be considered in determining Montoya's sentence was harmless error.

## III. AUGUSTINE GOMEZ

### A.

Defendant Gomez was arrested in his Los Angeles, California, home on June 19, 1987, and was charged in Count One with conspiring to possess with intent to distribute and to distribute cocaine and 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 846. After arresting Gomez,

DEA agents searched his house, finding no narcotics but discovering an address book containing the names "Tomas Perez" and "Agustine [sic] Ramirez." [11] Gomez was charged with conspiracy and entered a plea of not guilty on June 24, 1987, and thereafter, on December 10, 1987, reiterated his not guilty plea in response to an identical charge contained in a superseding indictment.

A jury trial commenced on January 11, 1988, in which the government presented evidence establishing that during the course of the charged conspiracy, the defendant had numerous contacts with convicted co-conspirator Tomas Perez. Perez testified that he had known Gomez since 1979, and that they had discussed the sale of cocaine over the telephone. Despite these conversations, Perez denied that Gomez had provided him with cocaine. The government countered Perez's denial with transcripts of recorded telephone conversations [12] between Gomez and Perez, as well as with evidence of Gomez's and Perez's involvement with deliveries of large amounts of cash.

On March 17, 1987, Gomez told Perez that he had talked to "that guy" and that he was "starting to feel like it" and was "starting to want to." Perez replied that he needed to "see if something can [sic] be done" and asked if "he" had all the "information." Gomez responded that "he was going to check everything out real well" and would call "to tell him how many, how much he wants."

On March 19, 1987, Gomez asked Perez for a $500 loan. Perez reminded Gomez that he (Perez) still owed "fourteen" after deducting expenses, but Gomez replied that he only wanted "ten." Gomez stated that

---

**10.** The record does not reflect the date on which the sentencing transcript and nonreliance determination were attached to Montoya's presentence report.

**11.** A subsequent search of Augustine Ramirez's residence in Rockford revealed an address book containing the name "Augustine Gomez," along with Gomez's California telephone number.

**12.** On March 10, 1987, the government obtained court authorization to intercept and record tele-

phone calls to and from Perez's home in Rockford. This wire interception began on March 12, 1987, and continued until June 19, 1987. On April 24, 1987, the government received further authorization to intercept wire communications to and from Perez's business, also in Rockford. This interception took place from April 25, 1987, to May 24, 1987, and again from June 10, 1987, to June 19, 1987.

Chava, who Perez later identified as Francisco Alvarado, would be in Rockford that night and would return to Los Angeles the next morning. Based on this conversation, the Rockford Police Department set up surveillance at the Regal 8 Motel in Rockford where Perez had agreed to meet Alvarado. On March 19, 1987, Gomez called Perez, gave him a room number at the Regal 8 and stated that "the guy was already there." Immediately after this call, Perez called Alvarado at the motel and asked if Augustine had told him (Alvarado) about "the request," to which Alvarado replied that he had. The following morning, March 20, 1987, at approximately 7:28 a.m., Alvarado called Perez and told him that someone had arrived and had left "that." He asked Perez what he should do about getting "the errand." Perez replied that he would come to the motel. Approximately one hour later, Rockford police observed Perez entering Alvarado's room. Perez and Alvarado, who was observed carrying a gray suitcase, left the motel and proceeded to the New Faust Hotel in Rockford, where Alvarado was seen making a phone call. Telephone records introduced at trial revealed that on March 20, 1987, at 10:43 a.m., a telephone call was placed from the New Faust Hotel to Gomez's residence in California. Rockford police officers then followed Alvarado to the O'Hare Airport in Chicago, where they observed Alvarado purchase an airline ticket and place a second telephone call. Again, telephone records revealed that Gomez's residence in California received a call from O'Hare at the time the officers observed Alvarado place the second phone call. After Alvarado boarded an airplane bound for Los Angeles, California, the officers relayed his description to DEA agents working on a narcotics task force in the Los Angeles Airport.

The DEA agents identified Alvarado when he arrived at the Los Angeles Airport, observing him walk to the departure area and speak with two Hispanic men in a red truck. The agents were later advised that the truck was registered to Augustine Gomez. After the truck departed, Alvarado proceeded to the baggage claim area and retrieved the gray suitcase. The agents stopped Alvarado as he was leaving the terminal, asking if he was carrying narcotics or large amounts of cash. Alvarado responded that he was carrying approximately $13,000 and consented to a search of his luggage, where the agents found $26,960 in cash. The agents confiscated the money, gave Alvarado a receipt and explained the procedure to be followed in reclaiming the cash. The following day, March 21, 1987, a Spanish-speaking male telephoned Perez and told him "that they took the money" and that he would have to go to court if he wanted to claim it.

On April 24, 1987, Gomez and Perez engaged in another telephone conversation in which Gomez quoted Perez a price of $22,000 for a specific amount of cocaine. Perez asked Gomez to send the cocaine and to make it quick. Later that same day, Gomez called Perez and stated that "it" was coming. In a telephone conversation on May 6, 1987, Perez asked Gomez if "it—he" was there and Gomez stated that "it" would arrive by Saturday afternoon. Perez replied, "Oh, man," and said there was no need to talk about it further. Five days later, on May 11, 1987, Gomez called Perez's video store and left a message stating where he (Gomez) would be that day.

Donald Gilgan, an employee of I. Spinello Locksmith in Rockford, testified that on May 11, 1987, he made an ignition key for a Pontiac Trans Am automobile for an individual named "A. Gomez." Two days later, May 13, 1987, Gomez and another individual, Jose Garcia, were stopped in the state of Utah while traveling westward in the same vehicle. Utah State Trooper Richard Haycock testified that he stopped the vehicle, driven by Garcia at the time, because its California license plates had expired. Gomez informed Officer Haycock that the two had been in Denver, Colorado, for a wedding and were returning to Los Angeles. Upon discovering that Garcia's driver's license had also expired, Haycock requested permission to search the interior of the vehicle. After Gomez consented, Haycock found a receipt issued to "A. Gomez" from I. Spinello in Rockford, Illinois,

and dated May 11, 1987. When presented with the receipt, Gomez denied having been in Illinois. Haycock then asked Gomez for permission to search the entire vehicle and Gomez consented.

Haycock discovered a homemade ramp in the trunk of the car. Upon seeing this, Gomez immediately asked Haycock if he would like to search his luggage. Haycock continued to examine the ramp, eventually discovering $44,020 in cash. Gomez stated that he did not know who owned the ramp and that two men with whom he was unfamiliar had put the ramp in the car. Gomez further stated that he did not know whether the ramp had been placed in the car in Denver or in Illinois. Before leaving, Haycock searched Gomez's luggage and found a notice of seizure and forfeiture of $26,960 issued to Francisco Alvarado, of which Gomez also denied having any knowledge. Gomez declined an invitation to obtain a receipt for the $44,020 at a nearby police station and left the scene.

The final conversation introduced by the government occurred after Gomez's stop in Utah. On May 17, 1987, Gomez telephoned Perez and asked him what he had. Perez stated that "we're going to take it easy until the next one" because "over here it's too much heat."

The government also introduced, over the defendant's objection, the testimony of United States Customs Inspector Charles Mazon, who stated that on January 14, 1985, while working at the Mexican border checkpoint in Tecate, California, he received notice that an automobile was in need of further searching. The person occupying the vehicle, Jose Garcia, stated that he was not the owner and had nothing to declare. The owner, in fact, was Gomez, who had walked across the border and was waiting for Garcia to enter the United States. Upon discovering that the automobile belonged to Gomez, Customs Inspector Mazon searched Gomez and Garcia. Although Mazon found no contraband on Gomez or in his vehicle, he discovered 103.5

grams of heroin hidden in Garcia's shoes and arrested Garcia and Gomez.

Four witnesses testified on Gomez's behalf, stating that he was in Rockford on May 2, 1987, to attend a baptism and, as a favor to his brother, drove back to Los Angeles with Jose Garcia on May 11, 1987. In rebuttal, the government presented evidence that Gomez called Perez from California on May 6, 1987, thus establishing that Gomez had not remained in Rockford between the May 2 baptism and May 11, the date he allegedly departed from Rockford for the first time. The government also presented rebuttal evidence that Gomez was required to obtain permission to travel outside of California, had done so on three previous occasions, but had failed to request permission to leave the state at any time during May of 1987.[13]

On January 20, 1988, the jury convicted Gomez on the conspiracy charge. On February 26, 1988, the trial court sentenced Gomez to 15 years' incarceration. Gomez appeals his conviction, arguing that: (1) the district court abused its discretion in admitting evidence of Gomez's arrest and the seizure of heroin from Jose Garcia at the Mexican border in 1985; and (2) there was insufficient evidence to establish beyond a reasonable doubt that Gomez participated in the charged conspiracy.

### B.

Gomez contends that the district court erred in admitting the testimony of Charles Mazon, a United States Customs Inspector at the California–Mexico border, concerning Gomez's arrest after Mazon discovered 103.5 grams of heroin in Jose Garcia's shoes. Specifically, Gomez argues that Mazon's testimony was inadmissible because it involved acts not charged in the indictment falling outside the parameters of Fed.R.Evid. 404(b). That rule, which governs the admission of "other acts" evidence, provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the char-

---

**13.** Gomez was on probation for a prior misdemeanor conviction and was required to report his absence from the Central District of California to his supervising probation officer. The jury was informed of neither Gomez's prior offense nor his probationary status.

acter of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In this circuit, district courts, before admitting "other acts" evidence under Rule 404(b), must analyze the evidence within the framework of a four-part test and determine that:

"(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Zapata*, 871 F.2d 616, 620 (7th Cir.1989). We note that Gomez's burden in challenging the trial court's admission of "other acts" evidence under Rule 404(b) and its corresponding four-part test is a heavy one. It is well established that a district court's decision to admit "other acts" evidence is reversible only upon a determination that the court committed a clear abuse of discretion. *Zapata*, 871 F.2d at 621; *United States v. Harrod*, 856 F.2d 996, 999 (7th Cir.1988).

At trial, the government introduced evidence that the defendant, accompanied by Jose Garcia, had been stopped in Utah on May 13, 1987, by Utah State Trooper Richard Haycock, while traveling westbound in an automobile driven by Garcia. After discovering that Garcia's driver's license had expired, Haycock searched the car and discovered $44,020 in cash that had been hidden in a ramp in the trunk of the vehicle. Gomez denied having knowledge of the money. The government argued at trial that the facts surrounding the Utah stop were evidence of the defendant's participation in the charged conspiracy, positing that Gomez was transporting money to Los Angeles after selling cocaine to Tomas Perez. Gomez's theory of defense was that because he allegedly had no knowledge of the money, it was impossible for him to form the requisite intent regarding the money found in the trunk, and thus, this evidence failed to demonstrate his participation in the conspiracy. In an attempt to establish the defendant's knowledge and intent regarding the $44,020, the government offered, pursuant to Rule 404(b), Mazon's testimony concerning Gomez's stop and arrest at the Mexican border in 1985 after 103.5 grams of heroin were discovered in Jose Garcia's shoes. The government's position was (and is) that the two stops were evidence of Gomez's and Garcia's method for transporting narcotics and the proceeds from sales thereof and was therefore admissible on the issue of knowledge and intent. The trial court agreed and, after determining that the evidence satisfied the four prongs of the *Zapata* test, *supra,* admitted the evidence.

On appeal, the defendant alleges that the district court abused its discretion in admitting Mazon's testimony because the second and fourth prongs of this Circuit's balancing test have not been satisfied.[14] Specifically, Gomez argues that there is little similarity between the circumstances of his arrest at the Mexican border in 1985 and

---

**14.** The defendant initially alleges that the district court failed to exercise any discretion whatsoever in admitting Mazon's testimony. We need not consider this allegation because of our holding, *infra,* that the district court properly determined that the testimony satisfied Rule 404(b)'s four-part balancing test, and thus, exercised well-reasoned discretion in admitting Mazon's testimony into evidence. In any event, we find Gomez's assertion to be without support in the record. The district court, prompted by the defendant's motion *in limine* to exclude the evidence, heard oral argument on the question of whether the evidence was admissible under Rule 404(b) and its corresponding balancing test on January 11, 1988. After the parties presented their arguments, the court announced that it would rule on the evidence the following day. On January 12, 1988, the court ruled that the evidence was admissible, addressing each of the elements set forth in *Zapata, supra.* Thus, the record reflects that the trial judge, aided by the parties' memoranda of law, considered the issue *overnight* and ruled on the admissibility of the evidence in light of the proper factors.

those of his stop in Utah in 1987, and that the probative value of the border stop evidence was greatly outweighed by its prejudicial effect.

■ In support of his claim that his arrest bears little similarity to his stop in Utah, Gomez argues that with regard to the border stop, "Jose Garcia was clearly the major actor," and that even assuming Gomez's knowledge of the heroin found in Garcia's shoes, "smuggling drugs in from Mexico has very little to do with a stop for unregistered license plates in Utah, more than two years later, and the discovery of money in the trunk." We disagree. As the government points out, the two stops exhibited many similarities, thus establishing Gomez's *modus operandi* for transporting contraband and proceeds from the sale thereof. For example, in each instance the defendant and Jose Garcia were traveling together, and Garcia was operating an automobile which Gomez claimed to own.[15] Finally, on both occasions, Gomez and Garcia were found transporting goods that had been purposefully hidden. Although the discovery of $44,020 in cash, viewed in isolation, would not automatically raise the same type of suspicions as those arising from the discovery of heroin, Gomez's behavior during the Utah stop, as well as the fact that the money was hidden in a secret compartment, as opposed to being on his person, supported the inference that the money was certainly suspect. Indeed, Gomez gave the officer false information concerning his whereabouts prior to being stopped, stating that he had not been in Rockford when, in fact, according to his own witnesses, Gomez had been in Rockford, Illinois, from May 2, 1987, until May 11, 1987. Gomez continued to persist in this false statement even after the officer discovered the work receipt from the locksmith in Rockford. Moreover, after Officer Haycock discovered the ramp, Gomez made an unsuccessful attempt to divert the officer's attention by offering to open his suitcase for Haycock to search. Finally, Gomez contradicted himself by stating that

two men he did not know put the ramp in the vehicle, and further that he did not know where this had been accomplished, in Denver or in Illinois.[16] In view of these facts, we agree with the district court's determination that the facts surrounding Gomez's arrest at the Mexican border and those surrounding his stop in Utah were sufficiently similar to be relevant on the issue of Gomez's knowledge and intent concerning the money found during the Utah stop.

We also reject the defendant's contention that the probative value of the "other acts" evidence was substantially outweighed by its prejudicial effect on the jury. As discussed above, the circumstances surrounding Gomez's arrest were relevant on the issue of his knowledge and intent regarding the $44,020 because both incidents reflected Gomez's *modus operandi* in transporting narcotics or the proceeds from sales thereof. As we stated in *United States v. Blandina*, 895 F.2d 293 (7th Cir. 1989):

"Relevant evidence is not inadmissible ... unless its probative value is *substantially* outweighed by the danger of *unfair* prejudice. The fact that evidence is prejudicial or damaging to the defendant does not of itself classify the evidence as inadmissible. *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985). Indeed, '[r]elevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter....' *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), cert. denied, 444 U.S. 862 [100 S.Ct. 128, 62 L.Ed.2d 83] (1979)."

895 F.2d at 299.

■ The trial transcript reflects that the trial judge heard oral argument on the defendant's motion *in limine* to exclude the evidence of Gomez's arrest on January 11, 1988. At this hearing, counsel on both sides presented in detail their respective

---

**15.** It was later discovered that Eva Campos, Gomez's sister-in-law, owned the Pontiac Trans Am involved in the Utah stop.

**16.** *See infra* note 18.

positions regarding the relative probative value and prejudicial effect of this evidence. Only after considering and weighing these arguments overnight did the court rule that the probative value of this evidence outweighed the danger of unfairly prejudicing the jury. Given these facts we refuse to second-guess the determination of the experienced trial judge. As we stated in *United States v. Brown*, 688 F.2d 1112, 1117 (7th Cir.1982): "The trial judge, who saw and heard the evidence firsthand, can best balance probity and prejudice." Further, the transcript reveals that the judge instructed the jury twice—immediately after Mazon's testimony and during the final charge to the jury—regarding the limited purpose for which this evidence was offered. In his final charge the judge stated:

> "You have heard evidence that the defendant was present at the United States/Mexico border in 1985 when Jose Garcia was stopped in the defendant's car and was found to possess heroin. This evidence of possession of heroin should not be considered in any way as part of the conspiracy charge against the defendant, Augustine Gomez. You may consider this evidence only on the question of the defendant's plan, knowledge, or intent and on the question of whether the defendant acted under the absence of mistake or accident."

We are convinced that the trial court's instructions mitigated any unfair prejudicial effect, if any, that Mazon's testimony might have had on the jury's decision-making process. Absent evidence to the contrary, "[w]e make the crucial and valid assumption that jurors carefully follow instructions given them by the court." *United States v. Stern*, 858 F.2d 1241, 1250 (7th Cir.1988).

In sum, we conclude that Gomez's challenges to the admissibility of the "other acts" evidence are without merit. The evidence of Gomez's arrest was sufficiently similar to the circumstances of his stop in Utah in which $44,020 was discovered concealed in his automobile. Further, the probative value of this evidence was not substantially outweighed by its risk of unfairly prejudicing the jury. Accordingly, we hold that the district court did not abuse its discretion in admitting Mazon's testimony.

## C.

Gomez next argues that the evidence presented at trial is insufficient to sustain the jury's verdict finding him guilty of conspiracy to possess with intent to distribute and to distribute cocaine and 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 846.

"In evaluating [Gomez's] sufficiency of the evidence challenge, we note that he bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)), *cert. denied*, — U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original and footnote omitted). Thus, the relevant inquiry is whether, after viewing the evidence in this light, "*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789. "Only when the record contains *no* evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir.1987) (quoting *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)), *cert. denied*, — U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

■ "A conspiracy is commonly defined as 'a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a crimi-

nal act.' " *United States v. Koenig,* 856 F.2d 843, 854 (7th Cir.1988) (quoting *United States v. DeCorte,* 851 F.2d 948, 953 (7th Cir.1988)). "Thus, the 'essential elements of conspiracy under § 846 [of the Controlled Substances Act] are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substances Act.' " *Nesbitt,* 852 F.2d at 1510 (quoting *United States v. Sweeney,* 688 F.2d 1131, 1140 (7th Cir.1982)). Furthermore, the government must establish that the defendant was aware of the conspiracy and intentionally "join[ed] and associat[ed] himself with its criminal design and purpose." *United States v. Griffin,* 827 F.2d 1108, 1117 (7th Cir.1987), *cert. denied,* 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988). In establishing these elements, we note that it is proper for the government to offer and for the jury to consider circumstantial evidence. *United States v. Vega,* 860 F.2d 779, 793 (7th Cir.1988). "By its very nature, a conspiracy 'is conceived and carried out clandestinely, and direct evidence of the crime is rarely available.' " *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983) (quoting *United States v. Washington,* 586 F.2d 1147, 1153 (7th Cir. 1978)). Thus, "[n]ot only is the use of circumstantial evidence permissible, but circumstantial evidence may be the *sole support* for a conviction." *United States v. Reed,* 875 F.2d 107, 111 (7th Cir.1989) (quoting *Vega,* 860 F.2d at 793–94) (emphasis in original and citations omitted). Although the jury's verdict may not rest "solely on the piling of inference upon inference ..., [t]he view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt." *Nesbitt,* 852 F.2d at 1511 (emphasis in original and citations omitted).

Gomez does not contest on appeal that the government failed to establish the existence of the charged conspiracy. Thus, the only question is whether the evidence supports the jury's conclusion that Gomez intentionally joined and participated in the conspiratorial scheme. *See Griffin, supra.*

In considering this question on previous occasions, this court has noted:

"Participation in a criminal conspiracy may be shown through the use of circumstantial evidence. Circumstantial evidence may include whether the defendant has a stake in the outcome of the conspiracy. Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict...."
"[M]ere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence of a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.' "

*United States v. Xheka,* 704 F.2d 974, 988–89 (7th Cir.) (quoting *United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978)), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (citations omitted). *Accord United States v. Diaz,* 876 F.2d 1344, 1352 (7th Cir.1989); *Vega,* 860 F.2d at 795.

Applying these standards to the facts of this case, there is little question that the government presented sufficient evidence from which the jury could conclude beyond a reasonable doubt that Gomez was a knowing participant in the charged conspiracy. Specifically, Gomez was implicated in the seizure of $26,960 from Francisco Alvarado at the Los Angeles Airport, as well as his arrest in Utah after $44,020 was discovered in the trunk of his car. With regard to the seizure of the $26,960, transcripts from telephone conversations between Gomez and convicted coconspirator Tomas Perez reveal that Gomez sent Alvarado to Rockford on an "errand" on March 19, 1987. On that same day, Gomez requested a loan of "ten" from Perez. On March 20, 1987, Rockford police

officers observed Perez meet with Alvarado at two hotels in the Rockford area. The officers also observed Alvarado make two telephone calls, one from a hotel in Rockford and the other from O'Hare Airport in Chicago. Telephone records introduced at trial revealed that Gomez's residence in Los Angeles had received telephone calls from both locations on March 20, 1987, at the same times that Alvarado was observed placing telephone calls. Furthermore, after Alvarado arrived in Los Angeles, DEA agents working on the narcotics task force in the Los Angeles Airport observed him speaking with two Hispanic males in a red truck registered to Gomez. When questioned by the agents as to whether he was carrying narcotics or large amounts of cash, Alvarado responded that he had approximately $13,000 in his possession. Upon the agents' discovery of $26,960, Alvarado claimed that various individuals, none of whom was the defendant, had lent him the money. The agents took possession of the $26,960, issued Alvarado a receipt for the seized money, and advised him how to retrieve it should he so desire. Less than two months later, on May 13, 1987, this receipt was found in Gomez's possession when he was stopped in Utah and $44,020 was discovered hidden in his vehicle.

A second sequence of events implicating Gomez as a participant in the conspiracy involves his trip to Rockford in May 1987. Perez admitted that on April 24, 1987, he and Gomez had engaged in a conversation in which Gomez proposed to sell him one kilogram of cocaine for $22,000. Prior to this conversation, Gomez had told Perez that he was "starting to feel like it" and "starting to want to." Gomez also stated that he intended to call "that guy ... to tell him how many, how much he wants." Less than two weeks later, on May 6, 1987, Gomez called Perez from California and Perez asked if "it-he" was there. Gomez

replied that "it" would arrive by the following Saturday.[17]

One week after this conversation, on May 13, 1987, Gomez was stopped in Utah en route from Rockford to Los Angeles and was found to be in possession of $44,020, which had been hidden in the trunk of his car. Utah State Trooper Richard Haycock also found a receipt from a Rockford (Illinois) locksmith issued to "A. Gomez" and dated May 11, 1987, and a receipt of seizure and forfeiture of $26,960 issued to Francisco Alvarado on March 20, 1987. Four days later, May 17, 1987, Gomez telephoned Perez and asked him what he had. Perez replied, "We're going to take it easy until the next one" because "over here it's too much heat."

The fact that portions of the conversations between Gomez and Perez may have been somewhat vague does not preclude a determination that Gomez participated in the drug conspiracy. *Vega*, 860 F.2d at 795. As we observed in *United States v. Zanin*, 831 F.2d 740, 744 (7th Cir.1987): "Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled allusions and code words." In this case the jury was confronted with conversations in which Gomez and Perez used code words such as "he" and "it." It is widely recognized that drug conspirators often employ code words in their conversations concerning narcotics transactions "when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted." *Vega*, 860 F.2d at 795. These code words, "when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can be clearly seen to be 'code words' for drugs." *Id.* Considering the use of these code words in light of the totality of the circumstances, especially Tomas Perez's admission that he and Gomez had negotiated the sale of cocaine on April

---

17. The May 6 conversation is significant not only because of the content of the discussion between Gomez and Perez, but also because it places Gomez in California on that date. This rebuts the testimony of defense witnesses, who

stated that Gomez came to Rockford on May 2, 1987, and, to the best of their knowledge, remained there until he departed for California with Jose Garcia on May 11, 1987.

24, 1987, the evidence of Gomez's participation in the conspiracy is most convincing.

As is common among defendants appealing conspiracy convictions under the federal narcotics laws, Gomez offers numerous explanations and denials regarding the government's evidence, all of which are either without support or contradicted by other evidence.[18] In any case, these explanations are irrelevant on appeal. As we noted in *Zanin, supra:*

> "Phyllis Zanin argues that all conversations in which she participated are susceptible to an innocent explanation. This may or may not be true—but it is irrelevant. The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt. The jury was entitled to draw reasonable inferences from the conversations."

831 F.2d at 745. Similarly, the jury in this case "exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt." *Nesbitt,* 852 F.2d at 1511. We emphasize that "[j]uries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict.... While '[c]ommon sense is not a substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.'"

*Id.* (citations omitted). After reviewing all of the evidence and the logical inferences drawn therefrom in the light most favorable to the government, we are satisfied that a rational jury could and did conclude beyond a reasonable doubt that Gomez participated in the conspiracy charged in Count One of the indictment.

## IV. AUGUSTINE RAMIREZ

### A.

Defendant Ramirez was arrested at his home in Rockford, Illinois, on June 19, 1987, and charged with conspiring to possess with intent to distribute and to distribute cocaine and 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 846 (Count One). Ramirez appeared in court with counsel on June 24, 1987, and entered a plea of not guilty. On December 2, 1987, Ramirez appeared in court with his attorney, stating that he wished to withdraw his original plea of not guilty and to enter a plea of guilty.

At the change of plea hearing, after defense counsel informed the court that Ramirez was "reasonably conversant in English," [19] the government recited the charge against Ramirez and presented an extensive factual basis to support Ramirez's guilty plea. The factual basis consisted primarily of a government informant's conversations with the defendant and other

---

**18.** For example, as we noted in note 17, Gomez's position that he was in Rockford continuously from May 2, 1987, when he attended a baptism of a friend's child, to May 11, 1987, when he departed Rockford with Jose Garcia, is contradicted by a telephone conversation recorded during the government's wiretap investigation. Specifically, the government presented evidence that Gomez telephoned Perez from his home in California on May 6, 1987. Regarding Gomez's denial of knowledge or intent with respect to the $44,020 found in his car in Utah, the government introduced evidence that Gomez had been apprehended transporting contraband with Jose Garcia, who was driving the car when it was stopped in Utah, under circumstances similar to those surrounding Gomez's transportation of the $44,020. *See supra* Section III.B. Further, there is an inherent contradiction between Gomez's statement that he had not been in Illinois and his statement that two men had placed the ramp containing the $44,020 in his car, but he

did not know whether they had put it there in Denver or in Illinois. If Gomez knew that two men had placed the ramp in the car, it is logical to infer that he knew when and where those men had done so.

**19.** After defense counsel's statement that Ramirez was conversant in English, the court explicitly questioned the defendant, who stated that he had been in the United States for approximately thirteen years and that he understood English "pretty well." Ramirez later informed the court that he had attended night school to learn English. Nonetheless, the court informed Ramirez that an interpreter was available to translate anything which Ramirez did not understand. The record reveals that at no point during the change of plea hearing did Ramirez request the services of the interpreter, and, in fact, stated that he understood everything discussed during the hearing.

co-conspirators indicted in Count One concerning various aspects of the drug trafficking operation. Specifically, the government alleged that on December 27, 1986, Ramirez recruited the informant to import narcotics from Mexico to Rockford, Illinois, and to distribute the proceeds from the sales of the drugs to the other members of the operation. On February 14, 1987, the informant recorded a conversation with Eva Ramirez,[20] who stated that the defendant would be taking care of business "at this end" while she and her husband Raul, the defendant's brother, were in El Paso, Texas. This fact was later confirmed in a conversation between the informant and Javier Preciado.[21] Preciado further stated that the defendant was selling marijuana at prices ranging from $650 to $800 per pound. Preciado, in a subsequent conversation, told the informant that Ramirez was helping him unload narcotics in Rockford and knew how to test them for quality.

The government also presented evidence of the seizure of $116,000 in cash from Tomas Perez at O'Hare Airport in Chicago. Perez, who was leaving for Mexico at the time of the seizure, informed law enforcement officials that approximately $30,000 of the cash belonged to Augustine Ramirez and that he (Perez) was transporting the money to Ramirez's relatives in Mexico. On May 14, 1987, the informant recorded a conversation with Perez, who stated that he could provide the informant with cocaine and marijuana for resale, but that she might have to obtain the drugs from Ramirez.

On June 13, 1987, the informant recorded a conversation with Ramirez in which she asked Ramirez for cocaine because Perez, her usual supplier, was in Mexico. Ramirez replied that it would cost $1,500 an ounce unless the informant agreed to purchase two ounces a week, in which case the price would be less. Ramirez stated, how-ever, that he did not keep drugs at his residence and suggested that she contact Preciado. Ramirez also suggested that the informant could earn a profit by functioning as a courier between the suppliers and distributors of cocaine. The government also noted that after arresting Ramirez and searching his house, DEA agents confiscated more than $37,000 in cash, approximately 240 pounds of marijuana, two handguns, and a triple-beam scale.

Following the government's presentation of facts, the trial judge asked Ramirez whether the government's factual allegations were correct. Ramirez replied, "Well, some of them are, some of them I don't [agree with]."

The judge then stated, "I want to go over the matters to which you understand you're pleading and ask you some specific questions concerning what your understanding is as to what you're pleading to at the present time." The court reiterated the conspiracy charge as it appeared in the indictment, asking Ramirez if he had read the indictment and discussed the conspiracy charge with his attorney. Ramirez responded in the affirmative. The court then asked the defendant to describe his "connection with this conspiracy."

Ramirez responded, "Well the connection with the conspiracy was ... I only did it with my brother and this other guy. Most of the other guys I didn't even know them, you know. The only thing I did is ... I helped a little bit my brother." The defendant proceeded to explain that he had assisted his brother, as well as an individual named Bertha Villareal and another individual, in unloading and weighing three 240–pound shipments of marijuana, and that one of the shipments had been stored at his home. Ramirez admitted that he knew the shipments were marijuana and stated that each shipment had a street value of approximately $100,000. Further, Ramirez stated that on one occasion he had sold approxi-

---

**20.** Eva Ramirez pled guilty to and was convicted on the conspiracy charge in Count One and sentenced to a term of three years' probation.

**21.** Javier Preciado pled guilty to and was convicted of conspiracy (Count One) and possessing with intent to distribute 15 kilograms of marijuana (Count Fifteen). Preciado was sentenced to 8 years' imprisonment with a special parole term of two years to follow.

mately 25 pounds of marijuana for $500 per pound.

Following the defendant's statements regarding his involvement in the conspiracy, the court again asked him if he had any dispute with the evidence the government presented as the factual basis for his plea of guilty to the conspiracy charge. Ramirez stated that he had never recruited the informant to transport narcotics and cash, that he had neither possessed nor sold cocaine, that he was not serious when he told the informant he could supply her with cocaine, that no portion of the money seized from Perez at O'Hare belonged to him, and that he had never agreed to take over the business while his brother was in El Paso.

The government stated that the evidence contradicted Ramirez's denials, but that, in any case, Ramirez's description of his role and activities in the operation provided a sufficient factual basis for his plea of guilty to the conspiracy charge. The court agreed, but as a precautionary measure, again questioned the defendant regarding his role in the conspiracy. In response to the court's questions Ramirez confirmed that he had participated in three 240–pound shipments of marijuana, being paid $500 per shipment, and that one of the shipments had been stored in his house. Ramirez also confirmed that he had sold a portion from one of the shipments, profiting $700 on the sale. The court stated that considering all of Ramirez's admissions, there was a sufficient factual basis for his plea of guilty. The court then proceeded to inform him of the rights he was waiving by pleading guilty, specifically stating that the maximum penalty for his offense was life imprisonment and a $4,000,000 fine. The defendant stated that he understood all of his rights, as well as the maximum penalty, and further stated that he was, in fact, guilty of the conspiracy charge. The court thereafter accepted Ramirez's plea of guilty, stating that "the defendant is competent to enter his plea, that the plea is knowledgeable, voluntary, and has a basis in fact." The court then ordered the preparation of a presentence report.

Ramirez's sentencing hearing was held on February 26, 1988. In its factual statement in the presentence report, the government essentially restated the evidence presented as the factual basis for Ramirez's guilty plea at the defendant's change of plea hearing. In his statement in the presentence report, Ramirez insisted that his involvement in the conspiracy had been limited to assisting his brother with the three shipments of marijuana during 1986 and 1987. At the outset of the hearing, defense counsel informed the court that he had gone over the report with the defendant and that they were not contesting any of the facts presented in the report. The trial judge then addressed Ramirez, who confirmed that he had read the report, had gone over it with his attorney, and understood the factual allegations therein. The judge asked the defendant whether he wished to make any changes in the report. Ramirez responded, "Well, the ones I already told [my attorney]."

Defense counsel replied that there was, in fact, a reference in the report to the $37,000 found in Ramirez's possession at the time of his arrest and stated that the money belonged to the defendant's brother Raul. The judge stated that the objection was noted for the record, but that the reference would be left in the report as stated. The judge further stated that he intended to address the dispute in his Rule 32(c)(3)(D) findings.

After listening to the parties' sentencing arguments, the trial court sentenced the defendant to a period of twelve years' imprisonment. In passing sentence, the court stated that in its opinion the defendant "was heavily involved in this case," referring to the "250 pounds of marijuana, more than $37,000 in cash, and two nine-millimeter automatic pistols" found in his possession at the time of his arrest. The judge rejected the defendant's explanation that the pistols had been obtained for self-protection after his home had been burglarized, and stated, "I think he had them because he was a drug dealer, and he had them for his protection of his ill-gotten gains and the marijuana and cocaine that he was dealing with." Approximately one

month later, on April 4, 1988, the district court filed a written determination, pursuant to Fed.R.Crim.P. 32(c)(3)(D), stating that Ramirez had challenged the presentence report's reference to the $37,000 seized at the time of his arrest and that this matter had not been relied upon in determining Ramirez's sentence.

On appeal, Ramirez challenges his conviction and sentence on the conspiracy charge, contending that: (1) the district court failed to comply with Fed R.Crim.P. 11 in accepting his plea of guilty; and (2) his sentence should be vacated because (a) he was deprived of his sixth amendment right to effective assistance of counsel at his sentencing hearing, (b) the district court violated Fed.R.Crim.P. 32(c)(3)(D) by failing to state prior to or contemporaneous with sentencing that it would not consider the $37,000 found in Ramirez's home at the time of arrest in determining his sentence, and (c) the district court sentenced him under the wrong law.

### B.

Ramirez, in the context of a *pro se* brief, initially argues that his plea of guilty to the conspiracy charge is invalid because the district court failed to comply with Fed.R. Crim.P. 11 in accepting the plea. Specifically, Ramirez contends that his plea was not entered voluntarily and intelligently because the court failed to adhere to the admonition requirements set forth in Rule 11(c)(1).[22] Ramirez further argues that the district court violated Rule 11(f) in accepting his guilty plea because there was an inadequate factual basis for the plea.[23]

■ Rule 11(c)(1) sets forth procedures "designed to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary.[ ]" *McCarthy v. United States,* 394 U.S. 459, 465, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969) (footnote omitted). Toward this end, Rule 11(c)(1) "expressly directs the district judge to inquire whether a defendant who pleads guilty understands the nature of the charge against him and whether he is aware of the consequences of his plea." *Id.* As a rule, failure to comply with Rule 11(c)(1) constitutes reversible error in this circuit. *United States v. Peden,* 872 F.2d 1303, 1306 (7th Cir.1989). However, literal compliance is not required. In reviewing plea proceedings for compliance with Rule 11 we should not give " 'Rule 11 such a crabbed interpretation that ceremony [is] exalted over substance.' " *United States v. Ray,* 828 F.2d 399, 404 (7th Cir.1987), *cert. denied,* 485 U.S. 64, 108 S.Ct. 1233, 99 L.Ed.2d 432 (1988) (citation omitted). Rather, the issue is "whether, looking at the total circumstances surrounding the plea, the defendant was informed of his or her rights." *United States v. Frazier,* 705 F.2d 903, 907 (7th Cir.1983) (per curiam).

■ Despite the district judge's detailed questioning of Ramirez at the change of plea hearing, as well as his explicit finding that Ramirez's decision to plead guilty was knowingly, intelligently and voluntarily made, Ramirez nevertheless contends that the district judge violated Rule 11(c)(1) by failing to inform him of the nature of the conspiracy charge, the mandatory minimum sentence accompanying a conspiracy conviction under 21 U.S.C. § 846, and the possibility that he would be deported to Mexico upon the completion of his prison term. At the outset, we reject Ramirez's contention that the district court's failure to inform him of the possibility of deportation constitutes a violation of Rule 11. In

**22.** Rule 11(c)(1) provides:
 "Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:
 (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole term or term

of supervised release and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense."

**23.** Rule 11(f) provides:
 "Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea."

*United States v. Suter,* 755 F.2d 523, 525 (7th Cir.), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985), we stated that Rule 11 entitles a defendant "to be informed of the direct, not all the collateral, consequences of his plea." It is well settled that the possibility of deportation is a collateral consequence of a guilty plea.[24] *See United States v. Romero–Vilca,* 850 F.2d 177, 179 (3d Cir.1988); *Downs–Morgan v. United States,* 765 F.2d 1534, 1538 (11th Cir.1985); *United States v. Russell,* 686 F.2d 35, 39 (D.C.Cir.1982); *Nunez–Cordero v. United States,* 533 F.2d 723, 726 (1st Cir.1976); *Fruchtman v. Kenton,* 531 F.2d 946, 948–49 (9th Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *Michel v. United States,* 507 F.2d 461, 464–65 (2d Cir.1974). *See also United States v. George,* 869 F.2d 333, 337 (7th Cir.1989). Thus, the district court was not required to discuss the possibility of deportation with the defendant and did not violate Rule 11(c)(1) in this regard.

Similarly unavailing is Ramirez's assertion that the court violated Rule 11 by failing to inform him that a mandatory minimum sentence of ten years' imprisonment accompanied a conviction for conspiracy under 21 U.S.C. § 846. At the time Ramirez was sentenced, section 846 provided:

"Any person who ... conspires to commit any offense in this subchapter is punishable by imprisonment or fine or both which *may not exceed the maximum punishment* prescribed for the offense, the commission of which was the object of the ... conspiracy." (Emphasis added).[25] Apparently the defendant is under the belief that his conspiracy conviction carried a ten-year minimum sentence because 21 U.S.C. § 841(b)(1)(A)(iv) provides for a ten-year minimum penalty to individuals convicted of possessing with intent to distribute 1,000 kilograms or more of marijuana, which, according to the indictment, was the object of the conspiracy. This belief is somewhat puzzling in light of the fact that the government informed the defendant, as well as the court, that such was not the case in a pleading to correct prior representations by the United States Attorney that section 846 did, in fact, carry a minimum sentence of ten years.

 In any event, the statutory provision above makes no reference to a mandatory minimum penalty; rather, it provides only that a sentence imposed under that section may not exceed the maximum penalty accompanying the substantive offense charged as the object of the conspiracy. Where a conspiracy statute fails to make reference to special penalty provisions such as mandatory minimum periods of incarceration, the special penalties may not be imposed for convictions under the conspiracy statute. *See Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) (holding that "special parole term" accompanying a conviction for an offense charged as the object of the conspiracy is not imposable for violation of section 846).[26] Thus, no mandatory mini-

---

**24.** Indeed, the decision whether to institute deportation proceedings lies within the sole discretion of the Attorney General of the United States. 8 U.S.C. § 1251. *Johns v. Dept. of Justice of United States,* 653 F.2d 884, 889 (2d Cir.1981).

**25.** Section 846 was amended in the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, Title VI, § 6470(a), 102 Stat. 4181, 4312, 4377 (1988), to provide:

"Any person who ... conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the ... conspiracy." 21 U.S.C. § 846. Congress amended section 846 to clarify that special penalty provisions such as mandatory minimum sentences and special pa-

role terms imposable for substantive narcotics offenses are also applicable under this section. In adopting the current version of section 846, Congress stated that the intent of the amendment was to "make clear that any penalty that may be imposed for a substantive drug offense may be imposed for [a] conspiracy to commit that offense." 134 Cong.Rec. S17,366 (daily ed. Nov. 10, 1988) (section-by-section analysis of H.R. 5210, 100th Cong., 2d Sess.).

**26.** We note that the Court in *Bifulco* was confronted with the same version of section 846 that we are considering in this case. We also note that Congress, in amending § 846, *see supra* note 25, explicitly referred to the Supreme Court's decision in *Bifulco.*

mum penalty accompanied Ramirez's conspiracy conviction because the version of section 846 under which he was convicted makes no provision for the imposition of a minimum penalty. *United States v. Campbell*, 704 F.Supp. 661, 663–65 (E.D. Va.1989). Consequently, we hold that Ramirez's claim that the trial judge violated Rule 11 in failing to inform him of the mandatory minimum sentence under that section is without merit.

 Ramirez's final allegation of error under Rule 11(c)(1) is that the district court failed to explain the nature of the conspiracy charge contained in Count One of the indictment. It is well settled that "Rule 11(c)(1) requires that the district court, before accepting a guilty plea, inform the defendant of the nature of the charge and determine whether the defendant understands the charge." *United States v. Cusenza*, 749 F.2d 473, 474 (7th Cir.1984). The purpose of this requirement is to assure that a defendant, wishing to plead guilty, is not misled regarding the nature of the offense with which he stands charged. 1 C. Wright, *Federal Practice and Procedure* § 173, at 587 (2d ed. 1982). This court has recognized that "[t]he colloquy necessary to satisfy Rule 11 'will vary from case to case depending on the complexity of the charges and the personal characteristics of the defendant including age, education, intelligence, alacrity of his responses, and whether he is represented by counsel.'" *United States v. Darling*, 766 F.2d 1095, 1098 (7th Cir.1985) (citations omitted). Thus, in reviewing the particular plea procedure employed by a trial court we have adopted a "flexible and practical approach" focusing on "whether, under the totality of the circumstances, the purpose of Rule 11(c)(1) has been served." *United States v. Gray*, 611 F.2d 194, 199 (7th Cir.1979), *cert. denied*, 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980).

In the present case the district court explicitly informed the defendant that he was charged with conspiring with various individuals to possess with intent to distribute cocaine and marijuana. The court went on to state that "as part of the conspiracy, the defendants would and did travel between Rockford, the State of Texas, and the Republic of Mexico for the purpose of acquiring cocaine and marijuana for transportation to and distribution in Rockford." After reciting the conspiracy charge as it appeared in the indictment, the trial judge asked Ramirez if he had read the indictment and if he had discussed the conspiracy charge with his attorney; Ramirez responded that he had. Further, based on its questioning of Ramirez, the trial court explicitly found that Ramirez understood the nature of the charges against him. This alone has been held to be sufficient compliance with Rule 11(c)(1). *See United States v. Thompson*, 680 F.2d 1145, 1154–55 (7th Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982). Indeed, the court's statements informed Ramirez that he was charged with acting in concert with other individuals to possess and distribute narcotics in the Rockford area. This is the essence of conspiracy. *See United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) ("A conspiracy is commonly defined as 'a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.'" (quoting *United States v. DeCorte*, 851 F.2d 948, 953 (7th Cir.1988)).

 Furthermore, we are convinced from the colloquy between the court and Ramirez concerning his role in the conspiracy that he fully understood the nature of the charge against him. As an initial matter, we note that Ramirez was twenty-nine years old, had lived in the United States for approximately thirteen years, and had a good command of the English language. On two separate occasions during the guilty plea proceeding, Ramirez admitted that in 1986 and 1987 he had been paid to assist his brother Raul and at least two other individuals in unloading, weighing and storing three 240–pound shipments of marijuana. Ramirez stated that after receiving a shipment, he then waited for his brother to decide what he wanted to do with the marijuana. He also admitted that he sold 25 pounds from one of these shipments for a price of $500 per pound, making an overall profit of $700 from the sale.

Thus, Ramirez's own description of his role within the operation reflects that a confederation of individuals acted in concert to distribute narcotics, that Ramirez intentionally participated in this confederation and that he committed overt acts in furtherance of the confederation's conspiratorial scheme. Ramirez thus admitted to all of the elements necessary to establish guilt under 21 U.S.C. § 846, *see United States v. Mealy*, 851 F.2d 890, 896 (7th Cir.1988), which is sufficient to establish his understanding of the nature of the charge. *See Cusenza*, 749 F.2d at 476. The fact that Ramirez denied portions of the government's factual basis does not detract from our conclusion that he understood the nature of the conspiracy charge. Indeed, his denials reflect that "he was aware of what he had done and was clarifying what he had *not* done." *Ray*, 828 F.2d at 413 (emphasis in original). The defendant specifically stated that he fully understood the facts which he was admitting. Moreover, he admitted three different times that he had participated in the conspiracy charged. We are therefore satisfied that Ramirez understood the nature of the charge against him. Accordingly, we hold that the district court fully complied with Rule 11(c)(1) in accepting Ramirez's plea of guilty and affirm the court's conclusion that Ramirez's decision to enter the plea was made freely, voluntarily and with full knowledge of the charge against him as well as the rights he was relinquishing.

■■■ Ramirez also contends that the district court erred in accepting his guilty plea to the conspiracy charge because there was an inadequate factual basis for the plea. Rule 11(f) requires that the trial court, prior to accepting an accused's plea of guilty, determine that a factual basis exists to support the plea. The court can make this determination from "anything that appears on the record." *Ray*, 828 F.2d at 405–06. Thus, a trial court can satisfy itself that a factual basis exists from, among others, the government's presentation of evidence, the information contained in the presentence report, and the statements of the defendant in response to questions posed by the court. Although

the government presented overwhelming evidence to support Ramirez's plea during its recitation of the factual basis, we need look no further than the colloquy between the court and the defendant regarding Ramirez's role in the conspiracy. "As often occurs, parts of the colloquy simultaneously satisfy both the 'nature of the charge' and the 'factual basis' requirements of Rule 11." *United States v. Lovett*, 844 F.2d 487, 490 (7th Cir.1988). The defendant admitted that he acted in concert with his brother Raul and at least two other individuals in loading, storing, weighing, and distributing marijuana during 1986 and 1987. Thus, we agree with the trial court that the defendant's knowingly presented admissions were sufficient to establish an adequate factual basis for the defendant's guilty plea. Accordingly, we hold that Rule 11(f) has been satisfied in this case.

### C.

■■■ Ramirez next contends that we should vacate his sentence on the conspiracy charge and remand to the district court for resentencing. In support of this claim, Ramirez argues that his attorney's performance at the sentencing hearing amounted to constitutionally ineffective assistance of counsel. Further, he contends that the district court violated Fed.R. Crim.P. 32(c)(3)(D) in failing to determine until five weeks after sentencing that facts disputed by the defendant at the sentencing hearing had not been considered in formulating Ramirez's term of imprisonment. Finally, Ramirez argues that "he should have been sentenced under the 1982 law and not the 1986 law." With regard to the third argument, Ramirez is apparently contending that he should not have been sentenced under the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (1986), in which Congress increased the penalties for violations of the federal narcotics laws. We hold this argument to be without merit because Ramirez admitted to acting in furtherance of the charged conspiracy as late as June 18, 1987. Because the Anti–Drug Abuse Act was signed into law on October 27, 1986, well before Ramirez's participation in the conspiracy

ceased, the trial court properly sentenced him according to the provisions of the 1986 Act. Further, we need not consider Ramirez's ineffective assistance of counsel claim [27] because we agree with his contention that the trial court violated Rule 32(c)(3)(D), and thus, remand to the district court for resentencing on that basis.[28]

At the sentencing hearing defense counsel informed the court that Ramirez challenged the presentence report's characterization of the approximately $37,000 in cash found in the defendant's possession at the time of his arrest as assets attributable to Ramirez. According to the defendant, the money belonged to his brother Raul. The trial court noted the objection, but stated that the reference would be left in the report as stated, and that he would address the matter in his Rule 32(c)(3)(D) findings. Not until five weeks later did the court file its Rule 32(c)(3)(D) determination that this matter had not been relied on in sentencing the defendant, a technical violation of the rule. *See Kramer, supra,* 798 F.2d at 195. The government argues, as it did in Montoya's case, that resentencing is not required because the purposes of Rule 32(c)(3)(D) have been served despite the district court's failure to make its nonreliance determination in a timely fashion.

██ As noted above, one of the purposes of Rule 32(c)(3)(D) is to protect a defendant's right to be sentenced on the basis of accurate information. *See Eschweiler, supra,* 782 F.2d at 1385. Ramirez argues that despite the district court's determination of nonreliance, the district court did, in fact, rely on the $37,000 found in the defendant's possession in passing sentence. In support of this argument, Ramirez refers us to the following statement of the court at the sentencing hearing:

> "Augustine was heavily involved in this case. I would point out that at the time of his capture in this case, ... he had in his possession 250 pounds of marijuana,

*more than $37,000 in cash,* and two nine-millimeter pistols."

In its brief, the government completely ignores the district court's reference to the $37,000. When questioned on the court's reference to the $37,000 at oral argument, the government stated only that possession and ownership are separate legal concepts, and thus, the court's reference to the defendant's possession of the money in no way demonstrates that the court was attributing ownership to Ramirez. As we stated at oral argument, this explanation calls for hairsplitting. The trial judge explicitly referred to the $37,000 in concluding at sentencing that the defendant was "heavily involved in this case." Because of the court's somewhat ambiguous statement at sentencing referred to above, we refuse to speculate as to what the court meant by this reference. In our opinion, the defendant has made a sufficient showing that the court's *ex post facto* nonreliance determination regarding the money is not clear enough in its present form for us to hold that it is in compliance with the dictates of Rule 32(c)(3)(D).

Accordingly, we remand Ramirez's case to the district court for resentencing and, specifically, for a more definite finding as to Ramirez's ownership interest—whether it was mere possession or actual ownership—in the $37,000 and the effect of this interest on the sentence the court imposes.

## V. CONCLUSION

For all of the foregoing reasons, we affirm the sentence of Juan Montoya. We also affirm the conviction and sentence of Augustine Gomez. Finally, we affirm the conviction of Augustine Ramirez, but remand his case to the district court for resentencing.

**27.** Nonetheless, we note that based on our review of the record, we find Ramirez's ineffective assistance claim to be without merit.

**28.** We note that Ramirez's argument under Rule 32(c)(3)(D) is identical to the one raised by

defendant Montoya, *supra,* and thus, our discussion of the standards governing Montoya's claim in section II.B. of this opinion is equally applicable to Ramirez's Rule 32 argument and need not be repeated here.