**UNITED STATES of America,
Plaintiff–Appellee,**

*v.*

**Michael John CANINO, James Gilbert Marcum, John G. Flynn, and David Leonard Malkin, Defendants–Appellants.**

Nos. 89–1719, 89–1721, 89–1740 and 89–1746.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1991.

Decided Nov. 27, 1991.

As Corrected Dec. 9, 1991.

Rehearing and Rehearing En Banc Denied Jan. 14, 1992.

Michael C. Carr, Asst. U.S. Atty., Benton, Ill., argued, for plaintiff-appellee U.S.

Thomas M. Dawson, Leavenworth, Kan., Andrew Cotzin, Broad & Cassel, Joel Hirschhorn, argued, Miami, Fla., for defendant-appellant Michael J. Canino.

William J. Sheppard, Sheppard & White, Jacksonville, Fla., argued, for defendant-appellant James G. Marcum.

Kenneth N. Flaxmann, Chicago, Ill., for defendant-appellant John G. Flynn.

William H. Thomas, Miami, Fla., Lawrence Elliott Hirsch, Philadelphia, Pa., William J. Sheppard, argued, Sheppard & White, Jacksonville, Fla., Joel Hirschhorn, Miami, Fla., for defendant-appellant David Leonard Malkin.

Before EASTERBROOK and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.*

MANION, Circuit Judge.

On September 29, 1987, a federal grand jury handed down a two-count indictment filed in the Southern District of Illinois. Count 1 charged Michael John Canino with having knowingly and willingly engaged in a continuing criminal conspiracy to distribute and sell marijuana in violation of 21 U.S.C. § 848. To substantiate the "continuousness" of the criminal enterprise, the indictment listed five (5) specific occasions in which Canino spearheaded a group of people to possess and distribute marijuana. Count 2 of the indictment charged Canino, along with James G. Marcum, John G. Flynn, and David L. Malkin, with conspiracy to distribute over 1,000 pounds of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Following a jury trial in which the defendants were tried together, defendant Michael Canino was found guilty of violating the Continuing Criminal Enterprise statute (CCE), 21 U.S.C. § 848.[1] Canino, along

---

* This opinion has been circulated among the judges of this court in regular active service pursuant to Circuit Rule 40(f). A majority did not favor a rehearing en banc on the question of a possible conflict with the Third Circuit's decision in *United States v. Echeverri,* 854 F.2d 638 (3d Cir.1988). Judge Cudahy voted to rehear the case en banc.

1. The Continuing Criminal Enterprise statute applies special severe penalties to one who "is a

with defendants James G. Marcum, John G. Flynn, and David Malkin, were each convicted for their part in a conspiracy to distribute more than 1,000 pounds of marijuana. The defendants appeal from the verdict collectively on some issues and individually on others. After reviewing the record, the briefs and the law controlling this case, we affirm the jury verdict in all respects.

## I. Background

This case comes to us as one of a series of prosecutions in the Southern District of Illinois involving a nationwide marijuana importation/distribution network. The criminal defendants in this case are accused for their part in the notorious "Randy Lanier—Benjamin Kramer" drug ring that was responsible for importing over 600,000 pounds of marijuana into the United States over a ten-year period. The defendants Canino and Malkin were associated with what was called the "Pennsylvania Set-up." In very broad terms, Canino and Malkin had a system of procuring marijuana directly from Lanier and his importing operation and storing it in a "stash house" outside of Allentown, Pennsylvania, for ultimate distribution around the United States. Some of this marijuana was purchased by Canino to supply his drug-selling enterprise, and some was simply stored for Lanier's customers until they picked it up. Canino earned valuable commissions per pound on marijuana stored in his stash house.

The government produced evidence demonstrating that defendant Marcum was a substantial customer of illegal Lanier imports. Evidence at trial showed that Marcum purchased millions of dollars worth of marijuana from each shipment listed in the indictment for later sale and distribution. Marcum would regularly accept and transport his marijuana around the United States in tractor-trailers in order to supply his purchasers who themselves were large-scale pushers.

Defendant Flynn was an offloader for Lanier's group. Flynn was involved in each of the five specified acts listed in the indictment, helping get marijuana off the ships and loading it into the vans and tractor-trailers which were used in transporting the marijuana to its ultimate destination. At Lanier's behest, Flynn also went to Colombia, South America, to help arrange the purchasing, packing, and exporting of marijuana for three of the five Lanier-organized shipments which Canino is accused of having helped distribute.

As noted earlier, the indictment handed down by the grand jury listed five specific occasions on which an organization headed by Canino accepted drug shipments from Lanier-organized imports for distribution, sale and storage. Each itemized occasion in the indictment represented a partial distribution of an enormous shipment of marijuana from Randy Lanier to the group of distributors spearheaded by Canino. The first offense listed in the indictment involved Canino's involvement in the importation of a 36,000–pound shipment of marijuana in November or December 1982. By late 1982, Randy Lanier and Benjamin Kramer, who had been running a successful marijuana importing business since the late 1970's discovered that their imports had overgrown the storage capacity of their "stash house" in southern Florida. At that time they were expecting the arrival of their largest single shipment yet, a tugboat carrying 36,000 pounds of marijuana, and needed a place to store the shipment. Canino, until that time, had been a mere purchaser from the Lanier importing group. However, on this occasion Canino volunteered to make his stash house available for the marijuana's storage, and also volunteered to send workers and trucks to help unload the marijuana from the tugboat once it reached its port-of-call, Bridgeport, Connecticut, and safely transport the

---

part of a continuing series of violations" of federal drug laws and who "acts in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other posi- tion of management" throughout the continuing series of violations. In other words, the statute applies to drug "kingpins." 21 U.S.C. § 848(c)(2)(A).

drugs to Allentown, Pennsylvania. In addition to his warehousing functions, Canino continued to be a significant customer of the Lanier group.

Ultimately, the marijuana was trucked throughout the United States from Canino's stash house for distribution and sale. A portion of this 1982 load (as well as future loads warehoused by Canino) was sold to Jerry Juenger of Millstadt, Illinois. This connection is important because it is the conspiracy's connection with Millstadt, Illinois, which is the basis of the jurisdiction and venue of the United States District Court for the Southern District of Illinois. Juenger, who was questioned by and cooperated with authorities investigating the drug ring with which he was connected, provided helpful evidence for this case and in a number of other successful prosecutions pursued in the Southern District of Illinois.

The second drug transaction chronicled in the indictment involved a 1983 importation of 126,000 pounds of marijuana transported to New York City. The marijuana was stored in hollowed-out compartments in the sides of a specially designed barge. Thirty-six thousand pounds of this load went to Canino for storage and distribution. Much of this share was sold to defendant Malkin for further sale and distribution across the country.

In 1984 Canino was again involved in the distribution of another import of marijuana. This time the Lanier group successfully imported 150,000 pounds of marijuana in their special barge to San Francisco, California. Canino was contacted by the Lanier group and asked to send a tractor-trailer truck to accept his share of the contraband. Canino sent his brother John Canino with a truck to San Francisco to pick up roughly 27,000 pounds of marijuana. Half of the 27,000 pounds was sold to Malkin for distribution and sale to his particular customers.

Canino was getting tired of the relative infrequency of drug shipments organized by the Lanier group, which averaged out to once a year. Although not listed in the indictment of the present case, the government produced evidence at trial that Canino organized his own independent shipment in 1984 of 20,000 pounds of marijuana from Jamaica. This shipment, known at trial as the "Jamaica Load," was interdicted by law enforcement officials. Canino was indicted and ultimately convicted in 1986 for his efforts to import and distribute this shipment of marijuana. After Canino went to jail for this offense, defendant Malkin became the front man for Canino's organization, maintaining contact with representatives of the Lanier group on Canino's behalf in order to continue purchasing marijuana for Canino's drug enterprise and to make sure Canino could still continue receiving commissions for storing Lanier's marijuana.

While awaiting trial for the Jamaica Load offense, the indictment states that in 1985 Canino arranged to receive a portion of yet another bargeload of marijuana imported by Lanier and his group. This time, the barge was expected to arrive in New Orleans, Louisiana. Of the 165,000 pounds of the entire New Orleans shipment, Canino's group picked up 18,000 pounds. Canino had his cohort Malkin travel to Kansas City, Missouri, where most of the New Orleans shipment was being stored, to arrange having the 18,000 pounds brought back to the Allentown, Pennsylvania stash house by tractor-trailer truck.

The last shipment constituting the final itemized predicate act in the indictment involves a 1986 bargeload of marijuana once again shipped to San Francisco. As usual, regular Lanier customers were summoned to send representatives with tractor-trailers to San Francisco to receive their split from the imported shipment. The shipment which Malkin obtained on behalf of Canino's group was interdicted by the Federal Bureau of Investigation en route to Pennsylvania.

Confiscated record books and confessions acquired by investigating officials introduced at trial, as well as witnesses' testimony, revealed that defendant Marcum was a regular and substantial customer from Lanier and made a healthy profit selling his share of the Lanier imports. Flynn was shown at trial to be a steadfast

worker for Lanier, unloading shipments from boats and helping to stock the trucks of Lanier's regular crew of customers. Evidence showed that Flynn went to Colombia on several occasions to arrange the export of marijuana shipments for Lanier.

The trial lasted about two and one-half months and ended with a jury verdict finding Canino guilty of operating a Continuing Criminal Enterprise in the purchasing, storing and distribution of marijuana. In addition, Canino, Malkin, Marcum and Flynn were convicted on the conspiracy count to distribute over 1,000 pounds of marijuana. Judgment was entered and the individual defendants were sentenced to prison for the following terms: Canino, 26 years per count to run concurrently; Malkin, 22 years; Marcum, 22 years; and Flynn, 25 years.

The defendants on appeal claim some common grounds of error at trial. In addition, defendants Canino, Marcum and Flynn each filed with this court particularized grounds for appeal. We will first consider the common appeal grounds, and then examine the individual complaints of Canino, Flynn and Marcum respectively.

## II. Common Grounds

The defendants collectively claim that certain egregious events occurred at trial, each one amounting to reversible error. They claim that: (a) the trial contained an instance of gross prosecutorial misconduct; (b) the court should have declared a mistrial for all the defendants when a defendant in this action had his cause severed and his attorney disqualified after the trial had begun; (c) the prosecutor deliberately made erroneous, misleading, and prejudicial remarks to the jury in his closing argument; (d) the court failed to give the defendants' requested jury instruction relating to their "theory of defense"; (e) the court failed to give a jury instruction to the effect that evidence of a "buyer-seller" relationship in drugs is insufficient to prove the existence of a conspiracy; (f) the government did not demonstrate by a preponderance of the evidence that the Southern District of Illinois was the proper ven-

ue; (g) the defendants were denied examination of relevant presentence reports for exculpating information; and, (h) the prosecutor committed misconduct in the presentation of his case to the grand jury. Each argument will be explored *seriatim*.

### A. Prosecutorial Misconduct

During the trial a confrontation occurred between Assistant U.S. Attorney Michael Carr, who was prosecuting the case on behalf of the government, and Canino's defense attorney Joel Hirschhorn. Hirschhorn was questioning a key government witness about some inconsistent testimony the witness delivered at an earlier criminal trial not involving any of the defendants in the present litigation. Hirschhorn was reading to the witness from the previous trial's transcript when Carr objected that Hirschhorn was misstating and distorting what appeared in the transcript. Hirschhorn said he was reading "word for word." Carr kept asserting his charge against Hirschhorn. Finally the judge asked Hirschhorn:

> The Court: ... were you paraphrasing?
>
> Mr. Hirschhorn: No, I'm reading word for word.
>
> The Court: He's saying you are not.
>
> Mr. Hirschhorn: He's lying. I'm reading word for word.

The court permitted Hirschhorn's question as asked, overruling Carr's objection.

During a recess and out of the presence of the jury, Carr, outraged at being called a liar in front of the jury, approached Hirschhorn and in a hostile manner called Hirschhorn a "sleaze" and indicated that Hirschhorn was in "serious trouble" and that he "would get [him]." Carr reportedly also said that if Hirschhorn called him a liar before the jury again he would "break [his] nose." The discourse did not end here, however. Carr reportedly told Hirschhorn: "You are a pussy," "Don't talk to me," and "You have no balls." The defense claims that these highly provocative comments were intimidating to a degree that compromised defense counsels' ability to vigorously advocate their clients' cause, thus im-

pinging on the defendants' right to have a fair trial.

■ Allegations of prosecutorial misconduct are generally rooted in the due process clause. *United States v. Weaver*, 882 F.2d 1128, 1140–41 (7th Cir.1989). The basis for such a claim is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Therefore, the prosecutor's conduct is viewed not in isolation but in the context of the whole trial in order to determine if it was so inflammatory and prejudicial that it deprived a defendant of a fair trial. *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.1988).

■ We will give substantial weight to a district court's determination that a prosecutor's misconduct did not affect the trial. *United States v. Mazzone*, 782 F.2d 757, 763 (7th Cir.), *cert. denied*, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986). Although certainly inappropriate, Attorney Carr's comments could not have affected the jury's ability to judge the evidence or develop a prejudicial bias since the comments were not made in the jury's presence. Inappropriate prosecutorial comments, standing alone without a showing of adverse prejudicial impact on the jury, do not justify a reviewing court reversing a criminal conviction obtained in an otherwise fair trial. *United States v. Young*, 470 U.S. 1, 13–14, 105 S.Ct. 1038, 1045–1046, 84 L.Ed.2d 1 (1985). The district court judge was alerted to what transpired, and confidently permitted trial to proceed.

Additionally, the trial record does not reflect any undesirable "chilling" of the defense counsels' advocacy as a result of Carr's remarks. Advocacy by all four defense counsel at trial seemed suitably intense and vigorous. Indeed, lawyers for the defense were bold enough to file a Motion for Disqualification of Attorney Carr (which the court denied). Carr apologized both privately and publicly for his improper comments and his regrets were accepted by Hirschhorn. In fact, Hirschhorn (despite the Motion for Disqualification) indicated to the trial court that there

was no problem in his ability to litigate the case. During oral argument on appeal, Hirschhorn mentioned that he had argued many criminal cases in several federal circuits. It is highly unlikely that this brief verbal encounter had any effect on this very experienced attorney's ability to defend his client. Unfortunately this is not the first trial in which Hirschhorn and Carr faced off with each other (in the same court) and where similar accusations of prosecutorial misconduct were made. *See United States v. Mealy*, 851 F.2d 890 (7th Cir.1988). In *Mealy*, Carr and Hirschhorn were cautioned by this court to refrain from engaging in histrionic or written personal attacks against each other. *Id.* at 904. We refer them again to Judge Wood's admonishment and sound advice. But this "intimidation" argument has become a hollow refrain. There is no excuse for the outburst, but the outburst (unlike *Mealy*, not in the presence of the jury) is no excuse for demanding a new trial. The contention that the defendants were deprived of a fair trial because of their attorneys' fear that they themselves would be the target of prosecutorial reprisals has no merit. Carr's indignant reaction in "the heat of battle" was wrong, but other than resulting in an opportunity for tactical posturing by the defense, it had no effect on the trial. The court was correct in dismissing the defendants' motion to disqualify Carr, and we find no reversible error stemming from Carr's behavior under the circumstances.

## B. Severance of Defendant Marren

■ James J. Marren was indicted, along with the other defendants in this action, for conspiracy to distribute marijuana. Attorney Stephen J. Finta entered his appearance on behalf of defendant Marren. Trial against Marren, together with the other defendants in this action, commenced on November 15, 1988. Three days later the court declared a recess until November 29.

On November 29, 1988, the government filed a Motion for Disqualification of Attorney Finta and for severance of defendant Marren from the others on trial with him.

The motion alleged that during the court's recess credible government witnesses indicated that Finta "might be tied into [the] conspiracy that's alleged [in this case] or the overall [Lanier] conspiracy." Consequently, the government asserted that disqualification and severance were required because defendant Marren "ha[d] a built-in conflict, and a built-in reversal" based on his attorney's critical conflict of interest. Indeed, there was evidence suggesting that Finta had been operating as a front man for Marren, making arrangements for the importation and stashing of marijuana. Marren was ordered to obtain new counsel and got a new trial.

The court disqualified Finta and severed Marren's cause for separate adjudication. Marren and Finta appealed. This court reviewed that decision of the district court and affirmed. *United States v. Marren,* 919 F.2d 61 (7th Cir.1990). In so holding, this court found that Finta "was properly disqualified because identifiable improprieties involving him were shown and because public suspicion would outweigh any interest in his continuing representation." *Id.* at 63. This court also affirmed Marren's mistrial based on manifest necessity, finding that Finta's necessary disqualification from the case would have an "unacceptabl[e] [e]ffect" upon the jury. This court affirmed the district judge in his belief that the proceedings would be tainted by Finta's replacement by another counsel, or in the alternative, by his "double role as counsel and unsworn witness." *Id.*

The defendants in the present case asked the court that a general mistrial be declared for all the defendants when their codefendant Marren was removed from the trial. The defendants believe that the district court's refusal to grant a mistrial for everyone caused them to suffer "distinct prejudice." Essentially, the defendants feel that the Finta disqualification and Marren mistrial prejudiced the jury against the remaining defendants.

■■■ Denial of a motion for a mistrial is subject to the abuse of discretion standard of review. *United States v. Fulk,* 816 F.2d 1202, 1205 (7th Cir.1987); *United*

*States v. Phillips,* 640 F.2d 87, 91 (7th Cir.1981). In deciding whether the court abused its discretion, we assume that a trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial. *United States v. Liefer,* 778 F.2d 1236, 1245–46 (7th Cir. 1985). We have previously upheld a trial court's exercise of discretion in issuing a cautionary instruction, rather than declare a mistrial, to cure any potential prejudice. *See Fulk,* 816 F.2d at 1205–06; *Liefer,* 778 F.2d at 1246. The district court in this case was careful to announce cautionary instructions immediately after the jury was called in following the day-long hearing and resolution of the disqualification and severance matter conducted out of the jury's presence. The jury was instructed not to concern itself with the absence of defendant Marren, and to decide the case against each defendant based on the evidence introduced against the individual defendant.

Moreover, this court has already ruled on the timeliness of the government's motion for Finta's disqualification, and the adequacy of the notice to Marren and his opportunity to be heard on the disqualification and severance issue. We found that the government acted properly in bringing its motion to disqualify Finta as soon as the evidence against him became known to the government. *Marren,* 919 F.2d at 62. We also held that Marren had a hearing on the issue and an opportunity to move for a continuance (which he did not do) for further research and briefing. *Id.* at 63. In *Marren* we rejected the claim that Finta's and Marren's dismissal from this case was the product of prosecutorial abuse or manipulation or that the district court's decision to grant the government's motion for disqualification and severance was an abuse of discretion. *Id.* at 63–64. We therefore reject the same claim presently urged by the current defendants for the same reasons.

We find that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial where the interest of justice required the removal of a tainted

lawyer and his adversely affected client from the proceedings, and where any possible prejudicial effects of such removal on the jurors' minds, with respect to the remaining defendants, was cured by the court with an immediate cautionary instruction and a jury instruction at the trial's conclusion reminding them of their duty to consider separately the evidence against each defendant. *Cf. United States v. Barrientos,* 758 F.2d 1152, 1157 (7th Cir.1985) ("Failure to instruct a jury regarding a co-defendant's mid-trial absence ... has rarely been found to be plain error.").

## C. Prosecutor's Misleading Comments During Final Argument

■ The defense claims that the district court erred when it failed to correct a purported prejudicial mistake in the government's rebuttal to defense's closing argument. In closing, defense counsel argued that while appellants may have committed substantive drug offenses in other judicial districts, they were not guilty of the charged conspiracy. In effect, the defense was claiming that the defendants should be acquitted *here* (since they did not purposefully avail themselves of the Southern District of Illinois in the commission of their misdeeds) and instead should be charged with criminal offenses in the areas of the country where the bulk of their illegal conduct occurred.

In this rebuttal, Assistant U.S. Attorney Carr said:

Let them be charged in Pennsylvania. Mr. Malkin said, let them be charged in Pennsylvania. Mr. Sheppard [Marcum's attorney] said, let them be charged in Florida or Pennsylvania but not here. Well this is it, folks. The plea agreements that they have talked about where they say they can be charged in all these other counts (sic) [It should read "courts"], there is a section in the plea agreement that they didn't read out loud that's underlined. It says to the extent that the double jeopardy clause applies. Well what does that mean? That means this is the trial. You only have to go to trial once for the charge. It's right here.

The idea let them be charged in Philadelphia or Florida, that's gone. The double jeopardy clause applies. It's in all the plea agreements. Those other people can't be charged for some offense in Missouri that this same conspiracy is charged. It's unconstitutional and they know it.

The defense accuses Attorney Carr of trying to misinform the jury that if appellants were acquitted of the conspiracy charge, the doctrine of double jeopardy would bar prosecution for substantive acts, such as possession with intent to distribute marijuana or distribution of marijuana, in other districts. Based on their interpretation of Attorney Carr's statement, the defendants objected to what they thought was a misstatement of the law since double jeopardy does not bar successive trials on conspiracy and the underlying substantive counts. *Pereira v. United States,* 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); *United States v. Craig,* 573 F.2d 455, 485 (7th Cir.1977); *United States v. Cortwright,* 528 F.2d 168, 176 (7th Cir.1975). The defense thus made a request for a curative instruction. The district court declined to give a curative instruction. The defense claims on appeal that they were prejudiced when the prosecutor's "erroneous" remarks were allowed to stand, giving the jury an added sense of urgency to convict the defendants in the present proceeding notwithstanding the applicable legal standards.

The prosecutor's statement, in its context, was not an erroneous statement of the law. Drug offenses committed in Pennsylvania constituted the basis of the conspiracy charged in the Southern District of Illinois. If the government brought a subsequent *conspiracy* charge in Pennsylvania, then the Double Jeopardy Clause would intervene because in that case defendants would be prosecuted for the same offense. The prosecutor's comment, on its face, cannot seriously be understood to mean that charges concerning the lesser-included offenses constituting a conspiracy in this case could never be brought against the defendants if they are acquitted. The prosecutor only acknowledged the well-un-

derstood rule that the government could not charge another conspiracy against the defendants based on the same conduct used to prove this conspiracy.

If we thought that the prosecutor's statement could be construed as the defendants construe it, a question arises as to whether the prosecutor accurately described what the Double Jeopardy Clause prohibits. In *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the Supreme Court held that

> the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted.... The critical inquiry is what conduct the state will prove, not the evidence the state will use to prove that conduct.

*Id.* 110 S.Ct. at 2093. Two circuits have construed this language broadly, essentially holding that the Double Jeopardy Clause bars successive prosecutions not only for the same offense but also for the "conduct" or "actions" that contributed to that offense. *United States v. Felix*, 926 F.2d 1522 (10th Cir.1991); *United States v. Calderone*, 917 F.2d 717 (2d Cir.1990). This approach would probably bar subsequent prosecutions for the substantive crimes underlying the conspiracy in this case. Other circuits have construed *Grady* in a way that probably would allow subsequent prosecutions for the substantive crimes here. *United States v. Clark*, 928 F.2d 639 (4th Cir.1991); *United States v. Gonzalez*, 921 F.2d 1530 (11th Cir.1991); *see also Felix*, 926 F.2d at 1532–35 (Anderson, J., dissenting). We do not need to take sides in this dispute,[2] however, since we have held that the jury was unlikely to construe the prosecutor's statement in context as referring to anything other than a subsequent prosecution for the conspiracy charged in this case.

■ Even if it was error for the court to refuse a curative instruction or an explanation to the jury concerning the various remaining criminal charges which could be brought against the defendants and the remaining suitable jurisdictions for prosecutions, the error is harmless. Under Rule 52(a) of the Federal Rules of Criminal Procedure, any error "which does not affect substantial rights should be disregarded," and designated as "harmless." In considering whether a non-constitutional error is harmless, "[o]ur task is to gauge 'what effect the error had or reasonably may have had upon the jury's decision.' " *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir.1989) (quoting *United States v. Shepherd*, 576 F.2d 719, 723 (7th Cir.1978). Only if we are convinced that the error did not influence the jury or had only a very slight effect, and can so say with fair assurance, should we hold the error as harmless. *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir.1984); *see also United States v. Beasley*, 809 F.2d 1273, 1280 (7th Cir.1987) (error is harmless unless it results in actual prejudice or " 'had substantial and injurious effect or influence in determining the jury's verdict' " (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986))). Here an examination of the rebuttal, together with the rest of closing arguments and the evidence at trial, convinces us that any error was harmless. The jury was properly instructed as to the nature of the charged offenses and the requirements for conviction. The government's proof satisfactorily supports, and perhaps compels, a jury finding of guilt as to the charged violations without the government's purportedly ambiguous double jeopardy assertion. In light of the strength of the government's case, even if there was error the court's failure to issue a curative instruction referring to the prosecutor's double-jeopardy characterization would have been harmless. We find no prejudicial er-

---

2. It is possible this conflict may not be long-lived. The Supreme Court has granted certiorari in *Felix*. See —— U.S. ——, 112 S.Ct. 47, 116 L.Ed.2d 25 (1991). A petition for certiorari filed by the Solicitor General is still pending.

Ironically, in both petitions for certiorari the Solicitor General has argued for the narrower interpretation of *Grady,* the position opposite to that the government urges in this case.

ror in the prosecutor's remarks nor an abuse of trial court discretion in denying the defense's motion for a curative instruction.

### D. Theory of Defense Instruction

The defendants claim that the court erred by refusing to give their theory of defense instruction. At issue is the defendants' proposed Instruction No. 14 which stated:

> The defendant is not on trial for any *act* or *conduct* not alleged in the indictment. (Emphasis added.)

The district court rejected this formulation and inserted its own instruction, one that gave a more precise focus on the nature of the charge against the defendants (conspiracy) and what is necessary to make a proper finding of guilt. The court's jury instruction read:

> You may judge the defendants only on the *charges* alleged in the indictment. You may not convict them of any other alleged conspiracy in the event you should conclude that they have engaged in some other conspiracy. Therefore, if you are not convinced beyond a reasonable doubt that a particular defendant knowingly and intentionally joined the conspiracy alleged in the indictment, you must find that defendant not guilty.
>
> Even if you find that a particular defendant knowingly and intentionally joined a conspiracy other than that alleged in the indictment, you should nonetheless find that defendant guilty of the charge alleged in the indictment if you are convinced beyond a reasonable doubt that the defendant knowingly and intentionally joined the single overall conspiracy that is alleged in the indictment and the elements of which are otherwise contained in these instructions. (Emphasis added.)

The defense claims in their brief (Joint Brief, pp. 53–56) that the given instruction (in contrast to their proffered instruction No. 14) fails to address the defendants' theory of defense, namely the need for the government to prove that the acts charged in the indictment were committed in the

Southern District of Illinois, as opposed to other jurisdictions. The defendants claim that they "were entitled to their instruction [No. 14] as worded, since it properly focused attention on the issue and was not merely an isolated sentence of a much larger multiple conspiracy instruction." (Def. Joint Br. 54)

The wording of the defendants' proposed Instruction No. 14 does not, as is claimed, actually focus attention on the issue of whether the government failed to prove that acts charged in the indictment were committed in the Southern District of Illinois as opposed to other jurisdictions. Their instruction completely ignores the issue of venue altogether. It is a mystery how the defense believes that Defense Instruction No. 14 legally (or logically) relates to the defendants' venue-based theory of defense at all.

 In any event, Rule 30 of the Federal Rules of Criminal Procedure requires a defendant to object to the judge's refusal to tender an instruction and clearly state the reasons for his objection. *United States v. Jackson*, 569 F.2d 1003, 1009–10 (7th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978). Failure to do so constitutes waiver of all but prejudicial plain error. *Id.;* Fed.R.Crim.P. 52(b). In this case defendant Flynn completely waived this issue when his attorney asserted that defense instruction No. 14 should be withheld from the jury and urged the use of a modified version instead. Only Canino, Marcum, and Malkin objected to the court's refusal to give instruction No. 14—but none preserved the claim that this instruction was a theory of defense. Thus, we will review the district court's failure to give the defendants' proffered instruction only for plain error. *United States v. Green*, 779 F.2d 1313, 1319–1320 (7th Cir. 1985).

 Plain error must be of such a great magnitude that it probably changed the outcome of the trial, *see United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985), or if uncorrected, the error results in a miscarriage

of justice, *id.* The court's refusal of Defense Instruction No. 14 was not plain error. First, Instruction No. 14 is not itself an accurate statement of the law in that it suggests that "conduct" and "acts" not alleged in the indictment should be excluded from the jury's consideration of the defendants' guilt with respect to the CCE and conspiracy charges. This instruction is at odds with the indictment itself. It is also in conflict with the court's ruling which permits evidence of acts or conduct not charged in the indictment. Such acts and conduct are elements of the CCE count and the conspiracy count and are proper issues for consideration by the jury. Moreover, the instruction offered by the court simply rewords the thrust of the defendants' instruction—clearly indicating that the defendants are on trial for *only* the *charges* (i.e., conspiracy or CCE) listed in the indictment, and no others. The tendered instruction was clear and in conformance with the law of this case. The defendants were not denied a fair trial as a result of the court's refusal to give their instruction.

### E. Jury Instruction Relating to the Buyer–Seller Relationship Between Defendants

The defendants also claim that the district court committed error when it refused to give the following recommended instruction to the jury concerning their theory of defense that they were mere purchasers from the conspiracy:

> Mere proof of the existence of a buyer-seller relationship is not enough to convict a co-conspirator on drug conspiracy charges. Merely purchasing drugs or other property from the conspiracy, standing alone, can never establish membership in the conspiracy.

Our cases make clear that merely purchasing or selling drugs or other property from a conspiracy, standing alone, will not establish membership in a conspiracy. *See United States v. Manzella,* 791

F.2d 1263, 1265 (7th Cir.1986); *United States v. Keck,* 773 F.2d 759, 768 (7th Cir. 1985). However, our cases also make clear that a defendant is entitled to have a buyer-seller instruction only if such a theory is supported by the evidence. "Each drug conspiracy case must be analyzed according to its specific facts to determine whether a buyer-seller instruction is appropriate." *United States v. Douglas,* 818 F.2d 1317, 1321 (7th Cir.1987). In an effort to distinguish between those defendants who are purchasers to strictly supply their personal consumption versus purchasers who are drug distributors,[3] *Douglas* establishes that a court, in deciding whether an instruction is supported by the evidence in a particular case, may choose to consider such factors as: the quantity of drugs involved (in this case truckloads containing hundreds of thousands of pounds); the resale value of the drugs involved (here, millions of dollars' worth); whether the defendants were addicts (no evidence of this in the case); and, whether a jury could reasonably believe the quantity and quality of drugs are generally used for personal consumption (inconceivable in this case). Moreover, the court must consider whether the defendant has put forth the buyer-seller defense at trial.

In this case, based on the factors outlined in *Douglas,* the facts support the exclusion of the defendants' proposed instruction. In addition, the trial transcript is void of any assertion by any of the defendants that they were merely buyers or sellers—their defense was that their activities could not be prosecuted in the Southern District of Illinois. Therefore, the defendants were in no way prejudiced by the court's failure to give a buyer-seller instruction; such an instruction would have been an absurdity given the evidence submitted at trial.

### F. Venue Instruction

The defendants claim that it was error for the court to issue a jury instruc-

---

**3.** In *United States v. Marks,* 816 F.2d 1207 (7th Cir.1987), this court stated: "One who buys from a conspirator for resale is a member of the conspiracy if he knows at least its general aims." *Id.* at 1212.

tion which only required the government to prove by a preponderance of the evidence that venue existed in the Southern District of Illinois. The defendants claim that the jury should have been instructed that the government was required to prove venue beyond a reasonable doubt. The sole authority cited by defendants in their brief for their contention is *United States v. Andrus,* 775 F.2d 825 (7th Cir.1985), which states:

> Defendants ... argue that venue is not proper in the Central District of Illinois. Venue is an essential element of an offense that the government must prove beyond a reasonable doubt.

*Id.* at 846.

The defense is ill-served by relying upon the above-quoted passage from *Andrus* as being the law of this circuit. The quoted passage was merely a portion of this court's paraphrase of the defendant's argument in the *Andrus* case—it was not a holding. A little further along in that decision, in response to the quoted characterization on the law of venue, this court wrote: "In *United States v. Mayo,* 721 F.2d 1084 (7th Cir.1983), this court rejected the argument defendants press here." The law of this circuit is that venue is shown by a preponderance of the evidence, which may include inferences drawn from circumstantial evidence. *United States v. Marrinson,* 832 F.2d 1465, 1475 (7th Cir.1987); *United States v. Lewis,* 797 F.2d 358, 366 (7th Cir.1986); *United States v. Rodgers,* 755 F.2d 533, 549 n. 19 (7th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985); *United States v. Martin,* 732 F.2d 591, 593 (7th Cir.1984). The instruction given by the district court requiring that venue be established by a preponderance of the evidence was correct.

*G. Disclosure of Presentence Reports*

■ The defendants claim as error the failure of the trial court to disclose presentence reports of unindicted co-conspirators who were called into court as witnesses. Generally, presentence reports are helpful in effectively cross-examining witnesses because these reports may contain impeachment material. They may also contain exculpatory material culled from investigations and dealings with co-conspirators. *United States v. Anderson,* 724 F.2d 596, 598 (7th Cir.1984).

Nine months before trial began, the defendants filed a Motion for Production of Presentence Reports of the government's accomplice witnesses and an alternative motion for *in camera* inspection to determine the possible beneficial contents of such reports. The court entered an order denying the request for production due to the lack of any exculpatory evidence in those reports, but granted the review of such relevant documents *in camera* for the purpose of finding impeachment material useful in cross-examining the government's witnesses. However, the court required the defendants to notify the court of relevant reports that they especially wished to be reviewed. The district court did make periodic examinations and rulings on the existence of exculpatory or impeachment material in the presentence reports as requested by the defendants. Indeed, the court's decision is in accordance with established precedent in this area. In *Anderson,* this court held:

> Defendant's request that we extend *Figurski* and [*United States v.*] *Cyphers* [553 F.2d 1064 (7th Cir.1977)] to create a duty in the trial courts to disclose presentence reports about witnesses at the mere request of a criminal defendant is rejected. Rather, we uphold [that] ... [w]hen a defendant suspects that a witness' presentence report contains impeachment material, he should request the trial court to make an *in camera* examination of the report. If the examination reveals no impeachment material, the judge should so state; in that case, the trial judge should reveal no portion of the presentence report to defense counsel. If there is any impeachment material in the report, the judge should reveal to the defendant only the portions of the report that contain the impeaching material.

*Id.* at 598.

However, the defendants claim that the district court's review of the witnesses'

presentence reports was untimely. The defense claims that the district court very often did not review the presentence reports of the witnesses until well after they had testified—making the *in camera* review perfunctory and useless. In *United States v. Figurski,* 545 F.2d 389, 391 (4th Cir.1976), the Fourth Circuit noted that the proper evaluation of the significance of information in the reports involved the appraisal of many factors likely to affect the trier of fact. Under many circumstances a ruling on a request for disclosure must be delayed until proffers of evidence can be made or until the government's case or the entire case has been presented so that the protected information can be examined in context. *Id.* at 392.

While the pretrial order entered by the court granted the defense motion for *in camera* review of the presentence reports, the court did instruct the defendants to notify the court of relevant reports that must be reviewed. Very often the defendants made their request for review at the last minute or during the cross-examination of the witness. It is no surprise that the results of the court's *in camera* review was sometimes not synchronized with defense counsel's needs and requirements. Nevertheless, *Figurski* does not require review of presentence reports prior to cross-examination as the defense argues in its brief. The procedure requested by the defense counsel and followed by the trial judge was identical to the one approved by this court in *Anderson,* where we held that the trial court's *in camera* examination of the presentence report, in combination with alternative avenues of impeachment, did not deprive the defendant of an effective defense.

### H. Grand Jury Abuse

The defendants alleged abuse and prosecutorial misconduct before the grand jury. The government denied the allegation and provided the grand jury transcript for review by the district court. The defense moved that the transcript be released to them for their inspection. The district court denied the motion.

In order for a party to gain access to the normally inaccessible transcripts of proceedings before a grand jury, there must be a showing of particularized need. *United States v. Edelson,* 581 F.2d 1290, 1291 (7th Cir.1978). Mere unsupported speculation of possible prosecutorial abuse does not meet the particularized need standard. *Id.* at 1291. To begin with, the defense, in its brief, has not pointed to anything in the record which might suggest that the prosecutor engaged in improper conduct before the grand jury. We are left with only the defense's suspicious hunch, as the following excerpt from the defense's brief revealed:

> Here, the Government has never denied, nor controverted defendants' allegations of abuse. Appellants have never viewed the grand jury instructions on the law. Appellants reason that based on the indictment itself, which does not contain a single, specific fact, the grand jury could not have been provided with anything other than erroneous, inadequate or misleading instructions on the elements, including venue, of the crimes charged against each defendant. The Government's failure to deny or controvert the defense allegations should be considered as an admission of defendants' allegations.

(Joint Br. p. 75.)

If a defendant wishes to determine whether the grand jury minutes contain any information inconsistent with the evidence offered by the government, "the proper procedure [is] to ask the district judge to examine the minutes *in camera* and report on the record whether they contained such inconsistent information." *Edelson,* 581 F.2d at 1292. The defense made the request, and the court made the inspection and found no alleged improprieties. We find no reversible error.

### III. Canino's Objections

Defendant Michael Canino makes four specific objections to his conviction. He claims the district court erred: (a) when it permitted the jury to rely on the unindicted "Jamaica Load" crime as a predicate act

for his CCE conviction; (b) when it made a "highly prejudicial" unilateral communication with the jury after they began deliberation; (c) when it failed to instruct the jury that they must reach unanimous agreement as to the predicate acts constituting the Continuing Criminal Enterprise charge; and (d) when it permitted Canino's conviction and sentencing on both the Continuing Criminal Enterprise count and the lesser included conspiracy count.

### A. Permissibility of Use of an Unindicted Crime as a Substantive Predicate in a Continuing Criminal Conspiracy

■ Michael Canino contests his conviction under the CCE statute. One of the elements of the CCE offense is that the defendant supervise five or more others in "a continuing series of violations" of the drug laws. Though the statute does not necessarily require it, courts commonly define "series" as three or more offenses. *See United States v. Baker,* 905 F.2d 1100, 1102–03 (7th Cir.1990). The jury instruction in this case did so. The court instructed the jury that:

> Thus, you must find beyond a reasonable doubt that the defendant is guilty of conspiracy to distribute more than 1,000 pounds of marijuana as charged in Count II and/or that he is guilty of knowingly and intentionally distributing marijuana or possessing with intent to distribute marijuana as set forth in paragraphs A through E of Count I of the indictment or he is guilty of knowingly and intentionally distributing or possessing with intent to distribute marijuana from a Jamaica Load in 1984, and that this conduct, together with any additional violations of the federal drug laws constituted a total of three or more violations of the federal drug laws committed over the period of time charged in Count I with a single or similar purpose. This will constitute a finding that the defendant engaged in a continuing series of violations.

As the above-quoted jury instruction makes clear, the CCE count of the indictment did not mention the "Jamaica Load" incident as one of the convictable predicate acts. However, the CCE count reads: "[[t]hat Michael John Canino knowingly organized a continuing series of federal drug trafficking violations] which violations *include* three or more of the violations *set forth in count 2* [the conspiracy charge] of this indictment and in paragraphs A through E [the five listed predicate acts of count 1]." Therefore the indictment is open-ended and non-exclusive with respect to the predicate acts necessary for conviction because it conditions a CCE conviction in Count 1 on any circumstances and events introduced under Count 2—which has no itemized predicate acts.

Several courts, including this one, have held that the government need not list the predicate acts in the indictment: *Baker,* 905 F.2d at 1103 (jury not limited to crimes charged in the indictments); *United States v. Markowski,* 772 F.2d 358, 361–62 (7th Cir.1985); *United States v. Aiello,* 864 F.2d 257, 265 (2d Cir.1988). And the "continuing series of violations" referred to in § 848 refers to offenses, not necessarily convictions. *Markowski,* 772 F.2d at 361. The only question then is whether the defendants knew of the offense in order to defend. In *United States v. Moya–Gomez,* 860 F.2d 706, 752 (7th Cir.1988), the court treated as significant the fact that although not listed in the indictment, the defendant had actual notice of the predicate acts on which the government would rely and the fact that the defendant did not contend that he was unable to defend against the charges. The court in that case relied on *United States v. Becton,* 751 F.2d 250, 256 (8th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985), which held that if a defendant has actual notice of activities to be introduced by the government, due process is satisfied regardless of whether offenses are charged.

In this case, Canino had plenty of notice that the government was aware of the "Jamaica Load" offense and eager to introduce it at trial. In fact, an appreciable portion of the pleadings and almost a volume of the pretrial transcript are concerned with the proper method of treating this evidence (i.e., exclusion, circumstantial

evidence, Fed.R.Evid. 404(b) evidence, or predicate act for the CCE). Canino had notice and opportunity to rebut, debunk, and defend himself from the implications of this evidence. We find that, consistent with *Baker*, the government had no obligation to list the "Jamaica Load" offense as a predicate act, and Canino was not denied due process because he had sufficient notice and opportunity to prepare a defense against the "Jamaica Load" evidence for the purposes that the government introduced it.

## B. Court's Unilateral Communication With the Jury

 The jury began its deliberations in this case at 3:10 p.m. on January 27, 1989. At 6:30 p.m. that same day the jury asked the court the following question in writing:

In the indictment under Count 1 where it reads "in or about March, 1980 and continuing thereafter, up to and including June 1987," does this mean the defendant had to be involved from March 1980 to June 1987? During this *entire* time? (Emphasis in original.)

The judge ultimately responded to the note as follows:

Members of the jury, in response to your question the time frame of the offense in Count 1 must be within the period alleged in the indictment but the defendant need not have committed the offense for the precise length of time stated in the indictment.

 Canino claims that the district court's note given to the jury was a unilateral communication and therefore a violation of Fed.R.Crim.P. 43(a), which states:

(a) The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impanelling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

Cases interpreting the rule have made it clear that defense counsel should be given an opportunity to be heard before the trial judge responds to the jury. *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v.*

*Burns*, 683 F.2d 1056 (7th Cir.1982). The record reveals that the parties were immediately made aware of the jury's question to the judge. The court drafted his proposed answer and presented it to all counsel. A full discussion ensued. In fact, the trial transcript contains a full 30 pages of mutual deliberations among the court, the defense, and the prosecutor over how to respond to the jury's question. Canino's attorney had significant input in the discussion, and at one point the court was inclined to follow the attorney's recommendation of rereading the CCE instruction in full. However, the judge finally submitted to the jury his earlier recommended answer, and then notified the parties of his decision and his action. The answer given by the court was an accurate statement of the law and in accordance with the written jury instructions submitted to the jury. *Cf. United States v. Velez*, 652 F.2d 258, 261–62 (2d Cir.1981). Therefore, Canino's objection is denied and we find no reason to disturb the jury's verdict on this basis.

Canino insists that the court should have recharged the jury on the essential elements of the offense. He claims prejudice since the jury rendered a verdict shortly after the response was given. But the jury's question did not demonstrate confusion about all of the instructions at hand. Rather, the jury simply asked whether the defendant had to have continuous involvement between 1980 and 1987. The obvious answer was "no" (the one the government preferred). The court's simple response answered the jury's question without embellishment, without distorting or subordinating the body of the instructions. The response was accurate and even-handed, and the defendant was not prejudiced. *See Velez*, 652 F.2d at 262 ("[A] supplemental charge is not defective where it responds adequately to the jury's request for clarification.").

## C. Court's Failure to Give Jury Unanimity Instruction on Predicate Acts Constituting Continuing Series

 Canino argues that he has been prejudiced because the district court did not instruct the jury that it had to unanimously agree on which drug offenses of-

fered into evidence constitute the series of three drug offenses the jury was instructed were necessary for a conviction under the CCE statute.[4] Canino cites *United States v. Echeverri*, 854 F.2d 638 (3d Cir.1988), in which the Third Circuit held that it was reversible error for a district court to fail to instruct a jury that they "must unanimously agree on which three acts constitute the continuing series of violations." *Id.* at 642.[5]

The Third Circuit in *Echeverri* clearly requires jury unanimity as to the three acts necessary for conviction under the CCE statute where the government offers evidence of numerous criminal violations, any three of which would substantiate the CCE charge. The court concluded that a "defendant is entitled to have the court insist on unanimous agreement as to *all* essential elements of the crime charged." *Echeverri*, at 643.[6] Curiously, however, in *United States v. Jackson*, 879 F.2d 85 (3d Cir. 1989), the Third Circuit did not apply this principle to the other part of the statute which requires the CCE defendant to have supervised at least five or more underlings in his enterprise. The court reasoned that:

> Unlike the three offenses necessary to constitute a series, which is the conduct which the CCE statute is designed to punish and deter, the identity of these underlings is peripheral to the statute's other primary concern, which is the defendant's exercise of the requisite degree of supervisory authority over a sizeable enterprise.

*Jackson*, 879 F.2d at 88–89.

*Jackson* represents a cautious departure from *Echeverri*—a departure which en-

---

4. The relevant portion of the CCE statute reads as follows:

> **(c) Continuing criminal enterprise defined**
> For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—
> (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
> (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
> (B) from which such person obtains substantial income or resources.

The statute and the legislative history are silent on what precisely constitutes a "continuing series." While the court instructed the jury in this case that three violations were necessary to constitute a series, in *United States v. Baker*, 905 F.2d 1100 (7th Cir.1990), we held that only two offenses—excluding a conspiracy or some other inchoate offense—are necessary to constitute a series. The district court's instruction that three offenses were necessary gave Canino more than he was entitled to.

5. Rule 31(a) of the Federal Rules of Criminal Procedure requires that a jury verdict in a federal criminal trial be unanimous. See *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (Sixth Amendment requires unanimous verdict in federal criminal trial).

6. The *Echeverri* court claims to rely on *United States v. Beros*, 833 F.2d 455 (3d Cir.1977), which itself relies heavily on *United States v.* *Gipson*, 553 F.2d 453 (5th Cir.1977) as support for its holding on jury unanimity for the predicate acts in a CCE charge. While *Gipson* did require jury unanimity in order to convict a defendant under the criminal statute in that case, the statute *Gipson* examined is very different from the CCE. In *Gipson* the defendant was charged under 18 U.S.C. § 2313 which provided a prison sentence and a fine to "[w]ho[m]ever receives, conceals, stores, barters, sells or disposes" of stolen cars. The Fifth Circuit, in *Gipson*, reviewed the district court's response to a jury question which read, in part: "If all twelve [jurors] agreed that [the defendant] had done some *one* of those acts [i.e., juror one thinks the defendant sold the stolen car, juror two thinks the defendant concealed it, etc.], but there was not agreement that he had done the same act, would that support a conviction? The answer is yes." *Id.* at 456 (emphasis added). The Fifth Circuit said no, and remanded the conviction for a new trial. The Fifth Circuit felt that the substantive acts listed in the statute were too disparate in kind (concealing, receiving, and storing on the one hand versus bartering, selling, and disposing on the other) that absent a specific unanimity instruction it was unclear whether the defendant was convicted for one class of offense or the other. This dichotomy in 18 U.S.C. § 2313 is not duplicated in the CCE. The CCE provides special penalties for one who engages in a "continuous series of violations" of federal drug laws. The expansive breadth of culpable offenses suitable for CCE treatment diminishes our need to ascertain precisely what acts each juror finds attributable to the defendant, and instead permits us to focus on whether the jury is convinced that the defendant performed these conspiratorial acts with the required frequency.

ables the Third Circuit to achieve the right result, but, in part, for the wrong reason. The court in *Jackson* relinquishes its belief that the defendant is entitled to juror unanimity "as to *all* essential elements of the crime charged." The court tries to reconcile *Jackson* with *Echeverri* by claiming that the identity of the five "underlings" is peripheral to the CCE's "other primary concern" (i.e., defendant's authority over the illegal enterprise). We see no basis for the Third Circuit's distinction. 21 U.S.C. § 848 makes both (a) the defendant's commission of a continuing series of drug violations and (b) the defendant's control over "5 or more" other persons to be joint and necessary conditions for a violation of, and conviction under, the CCE. In its process of distinguishing *Echeverri*, the Third Circuit took the lead from this circuit when it concluded that the question of jury unanimity relating to the "five or more" underlings component should also be answered with reference to the CCE's serious policy considerations. The *Jackson* court states:

> As the First and Seventh Circuits explained in [*United States v.*] *Tarvers* [833 F.2d 1068 (1st Cir.1987)] and [*United States v.*] *Markowski* [772 F.2d 358 (7th Cir.1985)], the five or more persons requirement of a CCE offense simply defines the size of the enterprise. This establishes that the organization in which the defendant played a leadership role was sufficiently large to warrant the enhanced punishment provided by the CCE statute. *Cf. United States v. Aguilar*, 843 F.2d 155, 157 (3d Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 305 [102 L.Ed.2d 324] (1988).... (in enacting § 848, Congress was clearly concerned with " 'large-scale profit-making enterprises engaged in the illegal importation, manufacture and distribution of controlled substances.' " (*quoting United States v. Valenzuela*, 596 F.2d 1361, 1367 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979))).

*Jackson*, 879 F.2d at 88.

More recently this court in *United States v. Bond*, 847 F.2d 1233 (7th Cir.1988), reiterated our holding in *Markowski* that a jury did not have to unanimously agree on the identities of the required "five or more other persons" for a CCE conviction. This court in *Bond* observed that "the jurors must find unanimously that there were five, but demanding agreement on which five could produce unjustified acquittals." 847 F.2d at 1237. Likewise, in *United States v. Markowski*, 772 F.2d 358, we observed that "[t]he statute does not make the identity of the five important, however. The CCE statute is directed against all enterprises of a certain size; the identity of those involved is irrelevant." *Id.* at 364. By analogy the same logic should apply with respect to predicate acts.

Indeed, Congress in passing the CCE was interested in thwarting the multiplied hazards resulting from the existence of large-scale (therefore highly organized and therefore effective) drug conspiracies. But the statute also strongly emphasizes its disapproval for "continuing" and enduring operations that happen to be of a large scale. It seems clear from the statute that the point of the CCE is to impose special punishment on those who organize and direct a "continuing" drug distribution system, the nature of which is evidenced by proof of the defendant's commission of a threshold number of criminal drug violations—a "continuing series." Therefore, for the reasons that a unanimously agreed-upon identification of the "five or more" controlled persons is not required in dealing with Congress' concern about large-scale drug enterprises, juror unanimity should not be required in identifying the predicate acts in enforcing Congress' concern about "continuing" drug enterprises. A "continuing series" identifies a drug enterprise which is effective and persistent—qualities which, according to Congress, warrant the enhanced punishment provided by the CCE statute. Consistent with the reasoning in *Bond, Markowski*, and *Jackson*, we hold that once each juror finds beyond a reasonable doubt that a CCE defendant committed at least two predicate offenses the purpose of the CCE is satisfied, and the defendant is suited for punishment consistent with the statute. We do not require that the jurors unanimously

agree as to the same predicate acts; this we feel will result in unjustified acquittals frustrating the important policy goals of the CCE.[7] The point of the CCE statute is to impose special punishment on those who organize and direct a significant number of larger-scale drug transactions; the exact specification by unanimous jury consent of any particular three of a greater number of offenses is irrelevant to any theory about why punishment should be enhanced for such uniquely antisocial activity. Moreover, we decline to adopt a chaotic rule which requires the jury to make a unanimous finding with respect to some factual issues (predicate acts) and be relieved of such a requirement in relation to findings of other factual issues ("five or more other persons") in order to convict a defendant of a Continuing Criminal Enterprise. We believe that the interests of justice are better served with a holding and reasoning regarding evidentiary findings in CCE cases corresponding to those announced in *Markowski* and *Bond*. The constitutional requirement of juror unanimity in federal criminal offenses is satisfied when each juror in a CCE trial is convinced beyond a reasonable doubt that a defendant charged under the CCE statute committed two predicate offenses.

### D. Concurrent Sentences for Conviction of Continuing Criminal Enterprise and Conspiracy

■ Canino's last argument is that his Fifth Amendment rights have been violated because he was convicted and sentenced for both a Continuing Criminal Enterprise and a conspiracy. The Fifth Amendment double jeopardy clause protects defendants from being tried and punished for the same offense twice. Canino claims that the conspiracy charge of which he was convicted is a lesser included offense of a CCE charge and therefore constitutes the same offense for Fifth Amendment purposes.[8] The Seventh Circuit rejected this argument in *United States v. Bond, supra.* In *Bond,* this court held that a court may impose a concurrent sentence for a § 846 conspiracy and a § 848 CCE conviction:

> The point … is that one can *both* conspire (agree to run a drug business) and run a continuing criminal enterprise (strike the agreement and succeed); the conspiracy … is a lesser included offense…. The two statutes reach the same group of persons. It is not illogical to convict a person of both agreeing to do something (§ 846) and succeeding on a grand scale (§ 848).

*Id.* at 1233.

The court went on to hold that "§ 846 and § 848 do not create identical offenses," *id.* at 1239, and "that concurrent sentences may be imposed under § 846 and § 848…. provided the cumulative punishment does not exceed the maximum under the CCE Act." *Id.* *See also Jeffers v. United States,* 432 U.S. 137 at 157–158, 97 S.Ct. 2207 at 2219–2220, 53 L.Ed.2d 168 (1977);

7. Juror unanimity seems functionally incongruous with the purposes of the CCE. For example, suppose the evidence shows that the accused was involved in four conspiratorial drug transactions constituting the "continuing series of violations" alleged in the indictment. Half the jurors believe that the defendant involved himself in offenses 1 through 3 beyond a reasonable doubt, and offense 4 more likely than not; the other half of the jury finds beyond a reasonable doubt that the defendant involved himself with offenses 2 through 4, and more likely than not in offense 1. If the jurors (being instructed that three predicate acts are necessary) were required to agree on which three predicate acts constituted the "continuing series" the defendant would be acquitted, despite the fact that everyone believed beyond a reasonable doubt that he was involved in three criminal acts. This result is at odds with the purpose of the CCE which is interested in punishing a defendant whom the jury is convinced was involved in a related series of drug activity with relevant frequency. It is the defendant's demonstrated frequency in participating in conspiratorial drug offenses that is the focus of the CCE offense, rather than any particularization of the acts used to demonstrate "continuous." A conviction under the CCE is justified when the jury has unanimously agreed sense *that* the defendant exhibited such conspiratorial frequency rather than a shared sense of *what* those acts may have been.

8. Canino was sentenced to twenty-six (26) years imprisonment on each of the two Counts. The sentence in Count 2 was to run concurrently with Count 1. In addition, Canino was ordered to pay a special assessment of $100 ($50 per count).

*United States v. Pace,* 898 F.2d 1218, 1236–37, fn. 6, (7th Cir.1990) (*consecutive* sentences for CCE and conspiracy convictions were vacated and remanded for sentencing consistent with *Bond* which allowed concurrent sentencing).

In this case Canino received 26 years imprisonment for each offense. The CCE conviction is non-parolable. The maximum allowable sentence for a CCE conviction is life imprisonment. Thus, the defendant's cumulative punishment clearly does not exceed the maximum allowable under the CCE conviction. If for any reason the CCE conviction is overturned as a result of a collateral attack, the conspiracy conviction and sentence will remain. This is also true for the special assessments. In *Jeffers,* it was held that the $100,000 maximum fine allowed under the CCE statute must be observed. Here the cumulative special assessments are clearly within the bounds of the CCE statute. Canino's convictions and sentences are proper.

## IV. Flynn's Objections

Defendant John G. Flynn raises four issues on appeal in hopes of reversing his conviction or reducing his sentence. Flynn charges the district court erred by: (a) denying Flynn's request for a bill of particulars; (b) allowing the prosecutor's allegedly prejudicial cross-examination of Flynn's wife; (c) improperly sentencing him; and (d) applying an enhanced sentence in violation of the *ex post facto* clause. The charges will be reviewed sequentially.

### A. The Bill of Particulars

■ Rule 7(f) of the Federal Rules of Criminal Procedure allows, in conjunction with the issuance of an indictment, for the filing of a bill of particulars—a more specific expression of the activities defendant is accused of having engaged in which are illegal. The decision whether to require a bill of particulars is within the sound discretion of the trial court, and that decision will not be overturned without a showing of an abuse of discretion. *United States v. Serola,* 767 F.2d 364 (7th Cir.

1985). The standard is whether the government's indictment sufficiently apprises the defendant of the charges to enable him to prepare for trial. *United States v. Kendall,* 665 F.2d 126, 134 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).

■ In *United States v. Dempsey,* 806 F.2d 766 (7th Cir.1986), this court held that an indictment for conspiracy under 21 U.S.C. §§ 841(a) and 846 need only allege the conspiracy to distribute drugs, the time frame in which it allegedly was operated, and the statute violated. No specific overt acts need be alleged. *Id.* at 769. Furthermore, a bill of particulars is not required when information necessary for a defendant's defense can be obtained through "some other satisfactory form." *See* Wright, *Federal Practice and Procedure: Crim.2d,* § 129, pp. 436–38 (1982). The defendant needs to know what the government intends to prove. *Id.*

■ The government maintained an "open-file" discovery policy which provided the defendants with complete and open discovery of all evidence assembled and revealed in the government's investigation. The "open-file" policy, by court order, permitted defense counsel, with proper notice, to make inspection of all files and testimony in the government's possession. The nature and operations of the "open-file" policy is an adequate "satisfactory form" of information retrieval, making the bill of particulars unnecessary. *Cf. United States v. Stephenson,* 924 F.2d 753, 761–62 (8th Cir.1991); *United States v. Kramer,* 711 F.2d 789, 796 (7th Cir.1983); *United States v. Schembari,* 484 F.2d 931, 935 (4th Cir.1973); *United States v. Kilroy,* 523 F.Supp. 206, 211 (E.D.Wis.1981). Since the defendant was sufficiently aware of the charges against him, and of what he was going to have to defend himself against at trial, the district court did not abuse its discretion in not ordering a bill of particulars.

### B. Cross–Examination of Flynn's Wife

■ Flynn claims that his wife was improperly questioned by the government on

cross-examination about her husband's infrequent filing of tax returns. Flynn believes that questioning on this topic, which was not discussed on direct examination, is in violation of the rules of evidence and resulted in juror prejudice.

Federal Rule of Evidence 611(b) governs the scope of cross-examination. While the rule specifically limits cross-examination to the subject matter of direct examination and to matters affecting witness credibility, it also provides: "[t]he court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

The record shows that the government's questioning and emphasis on the peripheral tax issue was brief and inconclusive—Mrs. Flynn's answer to the government's question concerning whether she was aware that her husband had not filed tax returns since 1980 was that she was unaware of her husband's filing habits. The relative insignificance of Mrs. Flynn's answer and the government's question does not compel us to assign error in this regard. *See United States v. DeGeratto*, 876 F.2d 576 (7th Cir.1989) ("[o]rdinarily error is found only when a prosecutor dwells at great length and in further detail on the particulars of prior crimes." *Id.* at 583).

## C. Sentencing

Flynn raises four issues which he claims improperly led to his receiving the "harshest sentence of any of the non-cooperating defendants in the conspiracy[ ]." First, Flynn claims that he was given an inadequate amount of time before sentencing to review the presentence report required by Fed.R.Crim.P. 32(c)(3). Because he had no time to make proper review and necessary objections to the presentence report contributing to his sentence, Flynn feels he must be resentenced.

Rule 32(c)(3) of the Federal Rules of Criminal Procedure provides that a defendant be given a reasonable time prior to sentencing to review his presentence report. At his disposition hearing, the court asked Flynn's counsel whether he desired additional time to discuss and review the report with his client. Counsel responded, "No, I don't think so. *I think my client is satisfied.*" We believe it is disingenuous of Flynn to now argue that he was prejudiced by an inadequate opportunity to review the presentence report after turning down an offer from the court for more time.

Second, Flynn charges that the district court failed to make written findings on the disputed matters that appear in the presentence report. Federal Rule of Criminal Procedure 32 provides that when the defendant alleges factual inaccuracies in the presentence report, "the court shall as to each matter controverted, make (i) a finding as to the allegations or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report. . . ." Fed.R.Crim.P. 32(c)(3)(D). Rule 32(c)(3)(D) serves a dual purpose. First, it protects a defendant's due process right to fair sentencing procedures, particularly the right to be sentenced on the basis of accurate information. *United States v. Montoya*, 891 F.2d 1273, 1279 (7th Cir.1989). The second purpose of Rule 32(c)(3)(D) is to provide a clear record of the disposition and resolution of controverted facts in the presentence report. *Montoya*, 891 F.2d at 1279; *United States v. Perez*, 858 F.2d 1272, 1276 (7th Cir.1988). In *United States v. Eschweiler*, 782 F.2d 1385, 1389 (7th Cir.1986), we held that resentencing is required if the defendant proves a violation of Fed.R.Crim.P. 32(c)(3)(D) by showing that (1) allegations of the presentence report's inaccuracy were before the court, and (2) the court failed to make findings regarding the controverted matters or a determination that the disputed information would not be used in sentencing.

Flynn did challenge a few factual aspects of the presentence investigation report. Flynn maintained that he was not in New Orleans for the conspiracy's 1985 import of marijuana, and he contested the quantity of

drugs associated in past convictions (unrelated to the tried conspiracy). The district court made oral findings with respect to each objection that it would accept the prosecutor's version of the presentence report as prepared unless further corroborating testimony for Flynn was available. In *United States v. Slaughter*, 900 F.2d 1119 (7th Cir.1990), this court held that even if a judge's oral rulings did not meet the requirements of Rule 32, "this error would be harmless" where the defendant fails to prove that the sentencing hearing failed to serve the purposes underlying Fed. R.Crim.P. 32. *Id.* at 1123; *see United States v. Montoya*, 891 F.2d 1273, 1279–81 (7th Cir.1989). In *Slaughter*, the district court made oral, on-the-record determinations concerning most (not all) of the defendant's objections to facts in the presentence report. Any difference between the judge's actual methodology and Rule 32 requirements was deemed harmless in that case where the defendant could not prove that his sentence was based on erroneous information. In this case, the district court ruled on *all* of Flynn's objections, orally and for the record. The court was wisely reluctant to depart from the presentence report without credible corroboration of Flynn's suggested factual scenarios. The purposes of Rule 32 have been satisfied. We have a record from which the propriety of Flynn's sentence can be analyzed and a sentence based on evidence which has not been sufficiently impeached. Any error in the court's failure to make written findings regarding Flynn's objections is harmless.

■ Third and fourth, Flynn claims that the judge improperly relied on uncounselled juvenile adjudications when imposing sentence, and that he improperly relied on evidence he heard in other related trials over which he presided. Both these contentions have little factual support.

At Flynn's disposition, the prosecutor diminished the relevance of Flynn's youthful crimes and focused on his history of adult drug convictions. In addition, the fact that a judge has presided over a prior or collateral trial (in this case Kramer's) has been held non-prejudicial. *See Cardillo v. Zyla*, 486 F.2d 473, 475 n. 1 (1st Cir.1973). Flynn only speculates that the judge could have used information from another trial, and has not provided any facts to show that the judge relied on any improper evidence at sentencing. Therefore, we find no error.

### D. Flynn and Marcum Sentences and the Ex Post Facto Clause [9]

■ Flynn and Marcum claim that the *ex post facto* clause requires proof that the defendant personally committed conspiratorial acts *after* the effective date of an amendment increasing the minimum sentence for violations of 21 U.S.C. §§ 841 and 846.[10]

On October 27, 1986, penalty enhancement provisions for 21 U.S.C. §§ 841, 846, and 848 violations went into effect. Flynn and Marcum claim that they should not be sentenced at the enhanced levels because their personal involvement in the conspiracy stopped before the penalty enhancement became effective, even though the conspiracy continued beyond that date.

■ In *United States v. Pace*, 898 F.2d 1218 (7th Cir.1990), this court did not condition the application of enhancement penalty provisions to a particular conspirator upon evidence of personal involvement of the particular conspirator—but instead conditioned the application of such a penalty upon a showing that the conspiracy endured beyond the effective date of the new penalty. Citing *United States v. Todd*, 735 F.2d 146, 150–51 (5th Cir.1984), we said in *Pace*, "a statute increasing the penalty for conspiracy does not violate the *ex post facto* clause [of the Constitution] when applied to a conspiracy begun before the increase that continued on after the increase." *Pace*, 898 F.2d at 1238. The government need not prove the defendant's involvement

---

**9.** This is the only issue defendant Marcum raises on appeal.

**10.** "A law that increases the punishment for a crime committed before the law was passed violates the [*ex post facto*] clause [of the Constitution, Art. I, § 9]." *Miller v. Florida*, 482 U.S. 423, 429, 107 S.Ct. 2446, 2450, 96 L.Ed.2d 351 (1987).

**952**

after the effective date of the enhanced penalty provision. The government must only prove that the defendant was involved in the conspiracy and that the conspiracy continued past that date. The burden of proving withdrawal is on the defendant. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989). For withdrawal to limit a conspirator's liability,

> mere cessation of activity is not enough ...; there must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators. And the burden of withdrawal lies on the defendant. *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964) (Friendly, J.) (citation omitted).

*Patel*, 879 F.2d at 294.

Flynn and Marcum did not try to overcome either of these conditions. The government proved the existence of the conspiracy beyond 1986 and the defendants did not prove that they made themselves completely unavailable for the conspiracy's purposes during that time.

### V.

For the reasons stated above, we affirm the defendants' convictions and sentences.

AFFIRMED.